ASKINS, (UNITED STATES v.) See Case No. 14,471.

## Case No. 589.

### ASPDEN'S ESTATE.

[2 Wall. Jr. 368.][1]

Circuit Court, E. D. Pennsylvania. April, 1853.

IMPLIED REPEAL OF STATUTE — HEIR AT LAW — STATUTORY HEIR AND COMMON LAW HEIR — PAROL EVIDENCE TO EXPLAIN WILL—COMMON LAW CANONS OF DESCENT — HEIRS EX PARTE PATERNA—AND HEIRS EX PARTE MATERNA.

1. The implied repeal of statutes not being readily to be inferred, a section of an old law containing a short but important expression, was held not to be repealed by a section in a new act which legislated generally on the same subject, omitting only the short expression; the later act being declared to be 'supplemental' to the old one: referring to it as 'incomplete,' and repealing, in terms, another section.

[Cited in U. S. v. The Cuba, Case No. 14,898.]

2. The term 'heir-at-law,' especially when found in context with the term 'lawful heir' as a synonyme, means; in Pennsylvania, the person on whom the law of the commonwealth casts the real estate of an intestate, at the time of his death; and it does not mean the person on whom the common law of England, as distinguished from the law of Pennsylvania, casts such estate.

3. A devise to one's 'heir-at-law,' or 'lawful heir,' passes the estate to such persons as, at the time of the testator's death, answer by the then existing law that description; and contemplates not only changes from death in the persons designated by the term, but changes also by legislation in the laws regulating successions and descent. Thus where a testator domiciled technically in Pennsylvania, though resident most of his life in England, devised estates to his 'heir-at-law,' or 'lawful heir,' those terms, as the law stood when he made his will, indicating the heir at the common law of England, but, at the time of the testator's death, indicating wholly different persons—st. whole classes, who were absolutely incapable of inheriting, as the law stood when the will was made—it was held that these last persons, and not the former person, were the 'heir-at-law,' or 'lawful heir,' and the parties, therefore, to take.

4. The terms 'heir-at-law,' or 'lawful heir,' mean so clearly and fixedly, in Pennsylvania, heir by the law of that state, whatever it may be, statutory or other, that its meaning is not easily controlled or shaped into the common law signification, when differing from it. Thus where a testator, domiciled technically in Pennsylvania, though resident most of his life in England, devised his estates to his 'heir-at-law,'

---

[1] [Reported by John William Wallace, Esq.]

or 'lawful heir,' he first paying certain legacies to A. B. & C.; it was held, that A. B. & C., being the Pennsylvania statutory heirs, should take the estates, notwithstanding the provision by which they would have first to pay themselves the legacies; and that the estates should not go to D., a different person, the heir at common law, who could more properly first pay the legacies to A. B. & C. while subject to, or after such payment, he took the estates himself.

5. Though the expression 'heir-at-law,' has been often used in professional and judicial parlance in Pennsylvania, as meaning heir at the common law of England, yet it is not rightly and with legal exactness so used. And especially when explained by the term 'lawful heir,' used as a synonyme with it, it presents no such ambiguity as to let in parol evidence, of any kind, as to the sense in which a testator technically domiciled in Pennsylvania, though resident most of his life in England, used it; or more particularly to show that such a testator used it in the sense of the English common law, i. e. to mean the person who should, at the time of his death, be nearest in blood and descent from a common ancestor of the full blood, by his father's side, and did not use it in its general legal sense, i. e. to mean the person or persons on whom the law of his domicil would cast his real estate, on his death intestate.

6. A general testamentary disposition of all one's 'estate real and personal,' to his 'heir-at-law,' or 'lawful heir,' by one who had no real estate, either when his will was made, or afterwards, is not a disposition of it to the next of kin; the term 'heir' being capable of an abstract sense as well as of a concrete one; and t not being true in legal any more than in popular sense, that there can be no heir, unless there is property strictly heritable.

7. A general testamentary disposition of all one's 'estate real and personal,' to his 'heir-at-law,' or 'lawful heir,' by one who, neither in law nor in fact, had any real estate, either when his will was made or afterwards, but who, some years prior to the time his will was made, received by devise from his father such estate, which he himself occupied for some time, and never aliened, but which had been confiscated by the commonwealth for his alleged treason, and had been, in law and in fact, irrecoverably taken from him by legislative acts, whose legality, validity, and moral justice he ever strenuously denied, and which estate he always pertinaciously, though absurdly, claimed during a term of more than forty years, and until the day of his death, to own and dispose of as his own, entertaining a hope or pretence of hope, though an absurd hope, that his heir if not himself, would some day gain it; it being a thing, as the testator warmly, though absurdly said, in which his heir had rights, and which "he could not lose:"—does not carry the personal estate into the channel of heirship ex parte paterna, as distinguished from heirs general.

8. Nor can evidence extrinsic to his will, of the testator's mistaken and absurd belief, be received to narrow the construction of terms of law so clear, unrestricted, and general as 'heir-at-law,' or 'lawful heir,' which terms, including heirs ex parte materna, as much as heirs ex parte paterna, pass the personal estate to the heirs of both sides jointly.

[9. Cited in Allen v. Allen's Ex'r, Case No. 211, to the point that although, in Pennsylvania, the orphans' court of the county, as a special court of equity, has jurisdiction of the accounts of executors, etc., it is no bar to the federal courts' exercising jurisdiction over exactly the same subjects, other things allowing, and the orphans' court not having at the time actual possession of the case or parties.]

In equity. By the eleventh section of a Pennsylvania statute of 1794, directing the descents of intestates' real estate in that commonwealth, it is enacted, as set forth in the left hand column below; and by the seventh section of an act of 1797, entitled an act supplementary to the former one,—the preamble to one section of which says, "And whereas the provisions of the act to which this act is a supplement, appear to be incomplete,"—it is enacted as set forth in the right hand column below. The two acts form a scheme of descents. The latter act nowhere in terms repeals any part of the former act, except a second section of it, which it does repeal in express terms.

Act 1794, § 11: "Where any person shall die seised as aforesaid, leaving no children, or lawful issue, father or mother, brothers or sisters, or their lawful issue, of the whole blood, then brothers and sisters of the half blood, and their lawful issue, shall inherit the same as aforesaid, in preference to the more remote kindred of the whole blood, unless where such inheritance came to the said person so seised by descent, devise, or gift, of some one of his or her ancestors, in which case, all those who are not of the blood of such ancestor shall be excluded from such inheritance."

Act 1797, § 7: "If the intestate shall die seised or possessed of real or personal estate as aforesaid, leaving neither widow nor lawful issue, father or mother, but brothers and sisters, of the whole and half blood, or their representatives, the brothers and sisters of the whole blood, and the legal representatives of such of the whole blood as are dead, shall inherit the real estate in fee simple, and the personal estate shall be distributed equally between the brothers and sisters of both the whole and half blood, or their representatives; but if there are no lawful issue, widow, father or mother, brothers or sisters, or their representatives, of the whole blood, then brothers and sisters of the half blood, shall inherit the said real estate in fee-simple, and the personal estate absolutely, the estate both real and personal to be held by them, as tenants in common, in equal parts, except such parts of the real estate as came to such intestate by descent, devise, or gift, of some one of his or her successors, in which case, all those who are not of the blood of such ancestor shall be excluded from such inheritance and such part of the real estate."

This act omits the provision of the former one "and their lawful issue."

The former of these acts—the one passed in 1794—was the first ever passed in Pennsylvania, which let in half blood as heirs to realty; and prior to the date of it, 'the heir-at-law,' under the statute laws of Pennsylvania, of a person situated as was the testator hereafter mentioned, would have been the same person as 'the heir,' according to the common law of England; it hav-

ing been established in Pennsylvania, until 1833,—when it was enacted by a statute of the Revised Code, that the heir at common law should not take, in any case, to the exclusion of other heirs and kindred standing in the same degree of consanguinity with him—that the common law here takes in all cases not provided for by statute.

Before either of the laws was in existence, st., in December, 1791. Mathias Aspden, a person born in Pennsylvania, and who, according to evidence ordered by the court to be taken, extrinsic to his will, was found by a verdict on a feigned issue ordered by this court, to have been domiciled there also, —White v. Brown, [Case No. 17,538,]—but who, as was shown by the same testimony, left this country at the beginning of the Revolution, and lived nearly all his life afterwards in England, and died there in 1824—made his will, a short and informal instrument, penned by himself. He gives "my estate, real and personal to my heir-at-law; first paying all my just debts and funeral expenses," and certain pecuniary legacies hereinafter mentioned. And in a postscript, referring to some doubts,—which he remarks were ill founded—as to his legitimacy, says, "It is my will that my estate, real and personal, to the party who would be my lawful heir in case there might arise no doubt on that head." The pecuniary legacies above referred to, were small legacies to each of the children of his half brother, Benjamin, and his half sister, Ann, living at the time of his death; to his half sister, Beersheba, and to his half brother, Roger. At the time he made his will, he had, besides these, as was proved by testimony extrinsic to the instrument, and received subject to exception, a half sister, Rebecca, and a half brother, James, neither of whom he mentions. This evidence showed that he had long maintained feelings of great animosity to this brother; that Rebecca was living in 1791, when he made his will, but died in 1814, leaving seven children; that Benjamin was dead prior to the date of the will; that Beersheba was married in 1761, and died about 1817, leaving five children; that Roger died between 1802 and 1814, leaving twelve children; and that Ann had died in 1769, leaving four children. None of these dates or items are specially important.

The will was made in Pennsylvania, and executed so as to pass real estate in that commonwealth, but not so as to pass such estate elsewhere. It had Pennsylvania executors; one of whom was to be the president "at the time being" of a bank in Pennsylvania; and it remained in Pennsylvania from its date in 1791, till the testator's death in England in 1824.

A very particular account is given of the testator in another case,—White v. Brown, [supra,]—where the question of his domicil was in issue; and it will perhaps make the comprehension of the present case more per-

fect, if the reader will refer to it. He was a strange, disordered and unhappy individual; a monomaniac, in short, and a fool in everything but amassing money. As already stated, he left this country in 1776, and died abroad in 1824. He was never married, and left neither father nor mother; brothers nor sisters of the whole blood, nor any descendant of them; nor brother nor sister of the half blood. He did however leave descendants of these last, and between them and his heir at the common law, this suit was raised about his estate, which, from the time of his death in 1824, had now grown, under the care of an American chancery, from its original amount of $250,000 to about three times that sum. The relatives whom he left were, as proved by extrinsic evidence: I. Nephews and nieces, named Harrison, the descendants of a half sister on his mother's side. II. Nephews and nieces, named Hartley, &c., the descendants of half brothers and sisters on his father's side. III. His heir at the common law of England, John Aspden, of that country; the oldest son of his paternal first cousin, the latter person having been alive at the date of the will, 1791, but not alive at the testator's death in 1824. The first and second parties stood, therefore, in equal nearness with each other, being each the issue of half blood brother and sisters; and both in greater nearness than the third party, John Aspden, whose superiority to them consisted in his being of the whole blood. The two former parties were also the testator's next of kin.

The whole of the large estate above spoken of was personal. The history of the testator's real estate, as it was proved by evidence extrinsic to the will, and which the court directed to be taken, was peculiar. Neither at the date of his will, nor afterwards, did he hold or claim any real estate acquired by purchase; nor any which came to him by descent from his maternal ancestors; but in the year 1765 he became by devise from his father, the owner, in fee, of a house and lot in Philadelphia, and of a farm in Chester county, which he never aliened. He continued in possession of this paternal real estate till 1781, when, he having fled the country, and gone to Great Britain, it was seized and confiscated under an attainder for an alleged treason. The legality and moral justice of this attainder, the testator always afterwards vehemently denied; maintaining that he had done nothing whatever to justify it, and that it was void. In a will made nine years after the confiscation, and long after every chance of recovering practically either estate had passed away forever, and within a few months of making the present will, he devised both these estates specifically, one to one person, and the other to another; speaking of each of them as my estate, &c., "which has been unjustly seized and confiscated, under pretence of high treason." These pre-

tensions and claim of legal ownership and control of these estates, though palpably absurd, to all practical objects, were always pertinaciously maintained by the testator, who seemed to consider this confiscation as the great event, and the greatest wrong of his life. And he ever entertained the hope —or at least so said—that his heir, if not himself, would gain it; it being a thing, as he said in 1796, "which interests the public, and also my heir at law, who has his right in this case, and cannot lose it."

Aspden's paternal grandmother bore the distinguished English name of Scroop; a matter of which he boasted; having, as he said, "a right to seal with a feather." And his English feelings were supposed to be proved by a letter to the Hon. Thomas Willing, of Philadelphia, in which he speaks of an heir at law to an estate to bear the port of a gentleman. In a petition for redress to the legislature of Pennsylvania, asking relief about his confiscated property, he says that "his heir at law in England" is entitled to £5,000 damages for the chance he has lost of getting his estate. Among the few books which he ever owned was Blackstone's Commentaries, in which the term 'heir-at-law,' in the chapter on 'Descents,' (volume 2,) is explained to be the heir by the common law of England. All these facts, as well as his belief and pretensions of ownership of the real estate, were proved of course by evidence extrinsic to the will, which the court had not ordered to be taken, and which was therefore taken subject to exception. Upon this state of facts, the two parties of the half blood, st. the Harrisons, ex parte paterna, and the Hartleys, ex parte materna, united to contest the right of the heir at common law, John Aspden, of England; and having defeated his claim, then contested the case with one another; the Harrisons, heirs ex parte paterna, claiming the whole estate as being the persons to whom the testator's real estate would have descended had he owned it; while the Hartleys, heirs ex parte materna, claimed to share the estate with them; because, in point of fact, there was no real estate ex parte paterna, to change the direction from heirs general to heirs on the father's side.

In the course of these contests, which occupied the court for many weeks, the following questions arose: The first five questions arising between the heir at common law, in opposition to both the parties of the half blood; and the sixth arising only after the claim of the heir at law was disposed of against him; and therefore arising between the two parties of the half blood alone.

I. Whether the 11th section of the act of 1794 was repealed by the 7th section of the act of 1797? for if it was, then there being no heir fixed by statute (the parties claiming here being but the issue not mentioned in the act of 1797 of brothers and sisters of the half blood), John Aspden, as heir at the common law, came in under the term 'heir-at-law;' the case being an omitted one, and there being no other law to provide for him.

II. Supposing this 11th section not so repealed, and that by the statute law of Pennsylvania, the issue of the brothers and sisters of the half blood would succeed, what, in Pennsylvania, is meant by 'heir-at-law?' Does it mean heir at the common law, or does it mean heir by the statute law of Pennsylvania? If it mean the former, John Aspden would still take in preference to the Harrisons and Hartleys.

III. Supposing this 11th section of the act of 1794, unrepealed, and that since the passage of that act, the term 'heir-at-law,' strictly and in its most accurate sense, means statutory heir, and so includes half blood; yet as the will was made before the passage of that act, and when, confessedly, the term had a different signification, and meant, both by the law of Pennsylvania and that of England, heir at the common law, Is the term to be taken according to the sense it had at the time of making the will, or does it attract to itself that new sense which the statute would give it?

IV. Conceding that this 11th section was repealed, and that 'heir-at-law,' unexplained, means heir by statute law, and so includes half blood; and finally, that the will must be taken to speak at the testator's death, Does the fact that by the will the 'heir-at-law,' to whom the bulk of the estate was devised, was first to pay legacies to certain relatives, or the fact of a provision for them at all, show that these relatives, who were of the half blood, were not meant to be included in the term 'heir-at-law,' and so to show that the term was used in the common law sense, which does not include the half blood; and not in the Pennsylvania statutory sense, which does?

V. Making all the previous concessions, and conceding in addition that the expression 'first paying,' is not enough to control the legal meaning of the term 'heir-at-law,' Does this term present a case of such ambiguity, as to its meaning in Pennsylvania, as that extrinsic evidence might be resorted to, to show that the testator used the term in the English common law, and not in the Pennsylvania statutory sense?

VI. Conceding that the term 'heir-at-law,' as used in the will, means heir by the statute law of the state, and not heir at the common law of England; by which concession the right of John Aspden is disposed of, and the two parties, Harrisons and Hartleys, on opposite sides of the half blood, let in; Is the legal operation in favour of heirs general of the phrase 'giving and bequeathing all my real and personal estate to my heir at law,' changed so as to operate in favour of heirs ex parte paterna, by the fact that the testator, some years prior to the date of his will, received by devise from his father real estate, which he himself never aliened, but which

had been, in fact and in law, confiscated by the state for his alleged acts of treason, the legality, validity, and moral justice of which attainder the testator ever strenuously denied; and which estate he always pertinaciously, though absurdly, claimed till the day of his death, to own and dispose of as his own; entertaining a hope, though an absurd hope, that his heir, if not himself, would some day gain it; it being a thing, as the testator warmly though absurdly said, in which his heir had 'rights,' and which "he could not lose."

VII. Can evidence extrinsic to the will be received, to show his mistaken and absurd belief?

The case was elaborately argued on the respective points, by Mr. Randall, Mr. Budd, and Mr. W. B. Reed, for the heir at common law, (Mr. W. L. Hirst represented certain Packers as next of kin of the whole blood, who originated the suit, but on the appearance of nearer heirs, the court considered their pretensions as palpably without foundation. Much of Mr. Hirst's argument supported the case of the heir-at-law, and is incorporated with the argument on that side;) and by Mr. J. M. Read, Mr. Newbold, Mr. Meredith, Mr. H. D. Gilpin, and Mr. W. M. Tilghman, for the statute heirs. Mr. Read and Mr. Newbold, after the heir at common law had been disposed of, arguing for the heirs ex parte paterna, the Hartleys, against their former colleagues, the remaining gentlemen, who claimed the whole estate for their particular clients, the Harrisons; heirs ex parte materna.

I. The seventh section of the act of 1797 repeals the eleventh section of the act of 1794.

In the attempt of the act of 1794 to provide for the issue of half blood, the first law which let in half blood at all, the legislature adopted a rule of preference over the more remote kindred of the whole, productive of great embarrassment in its application, and calculated to make titles dependent on facts often difficult to be ascertained. In this new canon of descents, what rule was to determine the remoteness of degree? See Christian's note to 2 Bl. Comm. c. 14, p. 240. The merit of the issue of brothers and sisters of the half blood might not be so apparent; the sympathy which justified a provision for the one did not operate so strongly in favour of the other; and there was evidently no good reason for giving the preference an indefinite extent. The language of the 11th section of the act of 1794 was too loose for correct legislation, and accordingly, in the enactment in the 7th section of the act of 1797, the objectionable clause giving the estate to the issue of brothers and sisters of the half blood, in preference to more remote kindred of the whole blood, is omitted. The new section is skilfully drawn. The word 'representatives' occurs twice in the context.

The omission to insert it in the giving clause in an act designed to perfect a code proved not satisfactory by experience, is pregnant with exclusion. The legislature, in so remote a case, might well mean to admit its inability to provide any rule always satisfactory, and to let in again the heir at common law, as a person as good as any. The common law was our possession and our glory; and except in the preference of the eldest son, and the exclusion of daughters, its canons of descent have never been odious.

A subsequent statute revising generally the subject-matter of a former one, impliedly repeals it. A 'supplemental' act may supply an act in toto, as well as in part. A 'supplemental' act, punishing a crime by imprisonment for ten years, would repeal one punishing the same offence by imprisonment for five years and fine. In a Massachusetts case, —Bartlet v. King, 12 Mass. 536, 545; and see Weatherford v. Weatherford, 8 Port. (Ala.) 171; Carter v. Hawley, Wright, 74; Mackey v. Hodgson, 9 Pa. St. 470,—a former act having provided for a case, its subject-matter was provided for again by a new act, which omitted some of the restrictions and limitations of the former act; yet the court considered that the old act was repealed in toto. Here the act of 1797 does legislate upon the identical particulars provided for by the act of 1794. Up to a late point in the new section, it re-enacts the provisions of the old one; an omission easily accounted for, and restoring the ancient law in that particular alone. Can the omitted words thus left out, be hunted up from the context of obsolete enactments, and be brought up in their dismembered state to have the force of law? But even if this eleventh section of the act of 1794, is not repealed, still John Aspden, of England, takes, for—

II. 'Heir-at-law' means in Pennsylvania. 'Heir at the common law.' In Johnson v. Haines' Lessee, 4 Dall. [4 U. S.] 64, in 1799, a question arose between certain brothers and sisters, and a party who was heir at the common law. The counsel or reporter speak of this latter person as "heir at the common law." The opinion of the supreme court came up on error to the high court of errors and appeals; a tribunal still higher, then existing, now abolished. It was the most solemn and august judicature ever known in Pennsylvania. The chief justice of Pennsylvania, M'Kean, delivered its unanimous opinion, and notwithstanding the technical language of counsel, as already given, was yet, sounding in his ears, twice speaks of that same party as the "heir-at-law," and speaks of him in no other way. In Jenks v. Backhouse, 1 Bin. 91, in 1803, a party similarly situated, is styled by reporter, one counsel and the court, "heir at the common law." And the counsel, quoting an English case, speaks of "the heir-at-law." In Cresoe v. Laidley, 2 Bin. 279, in 1810, the reporter styles him in one place, "heir at common

law," and in another, "heir-at-law." Mr. Rawle and Mr. Lewis, counsel of the party, call him once "heir-at-law," once "common law heir," and once "the heir." Mr. Binney and Mr. Hopkinson replying, call him once the "heir-at-law," and once the "common law heir." Chief Justice Tilghman in delivering the opinion, calls him three times "heir at common law," and once "heir-at-law." In Bevan v. Taylor, 7 Serg. & R. 397, in 1821, Judge Duncan styles him once "heir at common law," and once, apparently, "heir-at-law." This convertible language is also the language of legislation. In one section of an act of assembly of 1705, (3 Smith's Laws, p. 158, § 8,) the phrase "next heir, according to the course of the common law," is used; and also, "heir-at-law, according to the course aforesaid." In another, (Id. § 11,) younger children being spoken of, the oldest son—being in reference to them truly heir at the common law—is spoken of as "the heir-at-law;" and the term is used several times in the same way, in a supplemental act of 1764, (Id. p. 160, § 4.)

There is no doubt that until the statute of 1833 was passed, the heir at common law occupied in Pennsylvania a prominent and favoured position, and that he was recognized by the courts as the person always to take, except in every case where the statute has stripped him of his rights. "It must be remembered," says Chief Justice M'Kean, —Johnson v. Haines' Lessee, [supra,]—"that the system of distributing real estate in cases of intestacy, is an encroachment on the common law; and whenever such an encroachment takes away a right, which would otherwise be vested in the heir-at-law, the operation of the statute should not be extended further than the very words of the legislature."

In England there is descent in gavelkind, to all the sons, and descent in borough English, to the youngest son; and these inherit there by the law of special custom, just as all the children do here by special statute. Yet the term 'heir-at-law,' which is not more correct, by strict language, in England than it is here, runs throughout books common to both countries, as a phrase commonly and rightly used to indicate the "heir at common law." 2 Bl. Comm. 201; [Denn v. Gaskin,] Cowp. 661; [Doe v. Bower,] 3 Barn. & Adol. 453; [Carne v. Roch,] 4 Moore & P. 862. The common law being the general law, must generally be referred to, just as it generally governs. It is the nursing mother of us all. "In Pennsylvania," says the court in Hileman v. Bouslaugh, 13 Pa. St. 344, "a testator is to be considered as speaking in reference to the common law system of descents." Nor is the force of this expression 'heir-at-law,' qualified by the expression 'lawful heir,' in another part of the will. If there be any want of precision in the phrase "lawful heir," when applied to a devise of real estate, it cannot qualify or obscure the

meaning of the better defined term, "heir-at-law." An ambiguous phrase cannot be used to explain, but must itself be explained by one free from ambiguity. But standing alone, 'lawful heir' means heir jure haereditatis, right heir, own heir, or heir-at-law. In Davies v. Lowndes, 4 Bing. N. C. 478, which will be much relied on by the other side, when they divide and come to a contest between themselves, the testator uses the terms convertibly; meaning to indicate heir by the common law. The term, however, is used by Aspden in connexion with a doubt about his own legitimacy; just as a man speaks of his lawful child, in opposition to one not lawful, or illegitimate, or his lawful wife, in contrast with a woman to whom he may have been allied by ties less regular. What he meant, was 'the party who would be my heir in case I was lawfully born.' But he has confused his ideas, and therefore misuses his words; as is obvious from the sentence, which expresses no idea with correctness of language.

III. Conceding that the argument on neither of the preceding points is well founded, still the heir at common law takes; for, confessedly, he was 'heir-at-law' when the will was made. And the will must refer to the law as it then was, and not to the law as it might thereafter be changed. In this point of view the domicil is not material; for the laws of England and Pennsylvania were on this point the same in 1791, when the will was made. The testator has not given any reason to believe that he intended to leave his estate to such person as the laws of Pennsylvania from time to time might, could or would direct, to be the party or parties to whom the estate of an intestate should go. We cannot interpolate into the will an intention that during thirty-three years, in which it remained unchanged, the disposition of the testator's property should depend on these varying laws. In 1791, he declared his last will to be, that his estate should go to his 'heir-at-law.' The will was never revoked. The heir-at-law was a person perfectly defined. He was the person who should, at the time of the testator's death, be nearest in blood and descent from a common ancestor, of the full blood, by his father's side. John Aspden, heir at the common law, now claiming, answers that description. No one else does. This declaration made in 1791, the law repeats for the testator in articulo mortis.

In Martindale v. Warner, 15 Pa. St. 479, the supreme court of Pennsylvania has authoritatively settled this point. Between the making of the will and the death of the testator, the law in 1844 was changed, and the court determined that the law in existence at the time of the execution of the will must govern, without regard to the kind of property. "Though a will, it is true," says Judge Rogers, "does not take effect until after the testator's death, yet it is inchoate, though not consummate from the execution of it,

and for many purposes in law of which this is one, it relates to the time of the making." "I do not put the case," he says, "on the actual intention of the testator, but on his legal intention, which is the only safe rule. That the testator permitted his will to stand without alteration for several years, or that he may have known of the act of 1844, is nothing. It is a question of construction, depending on certain fixed principles, which ought not to be varied by forced speculation as to the knowledge or ignorance of testators, some of whom may, or others may not know of the statute and its legal construction." So in another Pennsylvania case, (Mullock v. Souder, 5 Watts & S. 198,) it was held that a statute "which provides that real estate acquired by the testator after the date of his will, shall pass by a general devise, does not apply to a will dated before its passage." The court says it could only be so applied "by giving the act a retroactive effect, which will never be done, where such does not expressly appear to be the design of the legislature; but the act will be left to operate on wills made and executed after the act comes into operation. A devise of real estate," it continues, "is in the nature of a conveyance; and a statute will not be considered as altering the effect of a conveyance already made, so as to pass more than it purported to pass when made. A retroactive effect will not be given to a statute so as to affect contracts or property. In the case of Ashburnham v. Bradshaw," 2 Atk. 36, it says, "a devise to charitable uses was made by a will dated in 1734. The testator lived till July, 1736, a month after the mortmain act had been passed, and upon a case, the judges certified that the devise was good. And to the same effect are Attorney-General v. Lloyd, 3 Atk. 551, and Same v. Andrews, 1 Ves. Sr. 225. There the application of the statute would have abridged the rights of the devisee; here it would abridge the right of the heirs; and there seems no difference in the principle."

The English authorities also adopt the same law. Lord C. J. Willes says, (Doe v. Underdown, Willes, 297,) that it is an established rule "that the intent of the testator ought always to be taken as things stood at the time of making his will, and is not to be collected from subsequent accidents, which the testator could not then foresee." In a much later case, (Doe v. Perratt, 5 Barn. & C. 69,) Holroyd, J., says that "it is laid down by Willes, C. J., in delivering the judgment of the court of common pleas, to be one of the certain and established rules for the construction of wills, that the intent of the testator ought always to be taken as things stood at the time of the making of his will. This rule had been before laid down by Lord C. J. King, in Wright v. Hall, [Fortes. 182,] and has been since confirmed by Lord Ellenborough, in delivering the judgment of the court of king's bench in Doe v. Scott," 3 Maule & S. 306, (and see Winter v. Perratt, 9 Clark &

F. 606.) Lord Ellenborough, quoting and adopting the opinion of Lord King and Lord Willes, says, "though the will is not complete until the death of the testator, so as to vest anything in the devisee, yet the intent of the testator is to be taken to be as things stood at the making of his will; for the testator makes his will as if he were to die that moment." 3 Maule & S. 306.

"It is the intention of testator," says Mr. Ram, (on Wills, pages 107, 108,) "at the time he makes his will, which alone the law will carry into effect. Events which have happened since the publication of a will, are unavailable to introduce an intention into it." Again—"It has been said by Lord Hardwicke, and it is often repeated, that a will must be made to speak from the testator's death, and be looked upon, not only as his last will, but his last words. It is true, that a will speaks from the death of the testator; but what does it speak? Does it say more than what the testator said when he made his will? Were it permitted to say more, clearly the law would fulfil an intention which is not expressed in it." If the testator, after making his will, should become insane, and continue so to the time of his death, could a change of intention, arising out of a change of law, which he had no capacity to counteract, be imputed to him? If A. devises £10 to the parish where he lives, and afterwards removes his habitation to another parish; the parish where he lived at the time of the will, shall have the legacy. 2 Com. Dig. tit. "Chancery," (3 Y. 16,) p. 679.

IV. But conceding the arguments on all the foregoing points to be ill founded, the direction of "first paying to the testator's half brothers and half sisters certain pecuniary legacies," controls the otherwise settled meaning of the term "heir-at-law," and gives it a common law as distinguished from a statutory sense. Using the term "heir-at-law," to mean heir at the common law, that person could very well first pay pecuniary legacies to persons of the half blood; for no person of the half blood could be "heir-at-law," in the common law sense. But using the term in the Pennsylvania statute sense, which, violating the rule of common law, prefers nearer half blood to more distant whole blood, an estate of half a million is divided between, or at least includes, parties who are first to pay themselves a few dollars as a specific legacy. The construction of the other side defeats this plain and positive direction. If the half blood inherits, there can of course be no previous payment, nor any payment. If the heir at common law inherits, there can be. One construction carries out a plain direction; the other directly defeats it, by rendering it impossible. Independently of the expression "first paying," &c., these provisions in favour of half brothers and sisters, &c., are forcible to show that even if naturally or by force of terms they are included, they are not in-

cluded by the testator's meaning. The authoritative case of Finlay v. King, 3 Pet. [28 U. S.] 377, (and see Darbison v. Beaumont, 1 P. Wms. 229; Spring v. Biles, 1 Term R. 435, note; and Doe v. Perratt, 5 Barn. & C. 48,) is much in point. Delivering the opinion in that case, Chief Justice Marshall, quoting the terms of the devise, which were very stiff and difficult to manage, says: "These words (the devise) certainly import that the whole estate should vest in possession at the same time, and mark with precision when that time shall be. This express provision can be contracted only by a strong and manifest intent to be collected from the whole will. But the intent of the testator is the codicil rule in the construction of wills; and if that intent can be clearly perceived, and is not contrary to some positive rule, often it must prevail; although in giving effect to it, some words should be rejected, or so restrained in their application, as materially to change the literal meaning of the particular sentence." And that strict lawyer, whose mind was itself law, went on to infer a particular meaning from exactly such indications as we seek to infer it from; to wit, that having already made a provision for certain parties, he did not mean to provide for them again by operation of law.

"The father," he says, "who was the presumptive heir when the will was made, died during the life of the testator. This event is supposed not to affect the construction of the will. But were it otherwise, were it supposed that he might look forward to that event, and contemplate his brothers and sisters as his probable heirs, the will furnishes arguments of great weight in support of the opinion that he did not intend them to take anything not expressly devised to them. The heirs of the testator, at the time of his death, were, a brother of the whole blood, a sister of the whole blood, the daughters of a sister of the whole blood, a brother of the half blood, and a sister of the half blood. Each of these persons is named in the will. For some of them ample provision is made. To others less favour is shown. The legacies to his brothers and sisters of the half blood are inconsiderable, while the bequests to those of the whole blood are large. No one of them is omitted. The circumstance that his mind was clearly directed to each, and that he has carefully measured out his bounty to each, discriminating between them so as to show great inequality of affection, operate powerfully against the opinion that he intended to leave a very large property to descend upon them by the silent operation of law."

V. Conceding, 1. That the 11th section in question is not repealed; 2. That in a strict legal and correct Pennsylvania sense, 'heir-at-law' does not mean heir at common law; 3. That the will must refer to the meaning of the term at the testator's death in 1824,

and not at the date of the will in 1791; and finally, that there is nothing in the will itself which controls the statutory meaning, still have we not shown that the expression was so capable of being used, and was in fact so often and so generally used in the common law sense also, that we may now resort to the extrinsic evidence of the testator's situation and circumstances, to show in what sense he used it? We seek to show no more than that Mr. Aspden has used a law term in the identical sense in which Chief Justice M'Kean and Chief Justice Tilghman, on the bench, and Mr. Rawle, Mr. William Lewis, Mr. Binney, and Mr. Hopkinson, at the bar, all of them speaking on a law subject, also used it. Admit that he might have meant heir by some statute law not then existing, but which might be enacted any time before his death; still, as the most eminent lawyers in this state have used it in another sense, may we not prove that Aspden fell into the same error, negligence, inaccurateness of style, or whatever else you choose to call it, the question being on a will, and a question of intention merely? Independently of the question of domicil, and admitting a technical domicil in Pennsylvania, cannot we show, in construing a word of such doubtful meaning, that in fact he lived all his life in England or in an English colony; that he had highly aristocratic feelings, boasting of his descent from the Scroops; speaking, as in his letter to Mr. Willing, of an heir at law to bear the port of a gentleman; that among the very few books he ever had was Blackstone's Commentaries, in which heir-at-law is used in one sense, and had no book in which it is used in another; that he always lived in hostility with the person to whom one construction of the term would give his estate, and always manifested vanity and pride in another person, whoever he might be, that would get it by another? That he discriminated among his step-brothers and sisters and their families, bestowing legacies with clear indications of difference, and excluding the one through whom some of these parties now claim. To enlarge upon these last facts as explanatory of the sense in which he used the doubtful term heir-at-law.

The testator excluded his step-sister Rebecca, then living, but who died about 1814 leaving seven children. He also excluded his step-brother James Hartley, because he was on bad terms with him. He included the children of his step-brother Benjamin, who had previously died leaving seven children. He included his step-sister Beersheba previously married and now having children, none of whom did he include. He included his step-brother Roger, who died between 1802 and 1814, leaving twelve children, none of whom did he include. He included the children of his step-sister Ann, who had died in 1769, leaving four children; but as to her children, and as to the children of Benjamin,

he limited the legacies expressly to such of these children "as should be living at the time of his death." In view of this discrimination and these limitations, can we not show that the testator did not intend to bequeath the mass of his fortune to his stepbrothers and sisters and their children, under the description of my heir at law?"

But without so much detail. A domicil merely technical, unaccompanied by actual residence, cannot furnish a satisfactory explanation of the testator's intentions. It was in the place of his residence that he acquired ideas and language. The presumption is, that he used words in the sense in which they were there understood. Cannot we show that the testator was educated in England, and lived there the greater part of his life, and so infer that the term 'heir-atlaw' was used in an English sense. The authorities, which give to the law of the domicil the supremacy, relate to the execution of wills, and to the transmission of property, in cases of intestacy, or when, in consequence of some positive law, the provisions of a will fail to take effect. They do not relate to the interpretation of wills, except where residence is combined with the technical domicil. Mr. Burge, (4 Confl. Laws, 590, 591,) in speaking of the rule, that the law of the domicil affords the rule of construction of wills, says, "The ground on which this rule rests is, that, as it becomes necessary to ascertain the sense in which the testator has used the expression, and what law of succession he contemplated, it is presumed that they were those of the country in which he was domiciled, because, it must be supposed, he was familiar with those laws. There are grounds for presuming he was· acquainted with them, but there exist no grounds for presuming him to be acquainted with any other laws of succession. In affixing the sense in which he has used certain words, terms, or phrases, he is presumed to have adopted that which prevailed in the place of his domicil. It has been sometimes said, that they ought to be understood in the sense in which they are accustomed to be used in the place where the will or contract was made. But it would be impossible to consider this as a general rule, for the residence of the party in the place may have been for so short a time as to negative the presumption, that he was even acquainted with that sense." Story (Confl. Laws, § 479f) says that the will is to be construed according to the "law of the place of his actual domicil," evidently excluding the mere technical domicil, without residence, like that which the circuit court imposed on Mr. Aspden. Courts having in view, therefore, not a technical but an actual domicil, of which residence is the essential feature, with a view to ascertain the sense in which the testator used the language of the will, cannot we point to his education and long residence in England, as furnishing evidence that the words of the will were used in the English sense?

VI. Argument for the paternal half-blood. —Supposing all the foregoing points to be decided against the heir at common law; that his pretensions are thus finally disposed of, and the half-blood let in as 'heir-at-law,' a new question arises, one between the halfblood itself. To which side of the half-blood, or how amongst it, does the estate go? Does it go to the paternal side alone; or to the maternal, in common with it? We contend for the paternal. By blending the personal estate with the real, the testator bequeathed both to the heir of the real estate. In order to ascertain the heir to whom the real estate is devised, it is necessary to know what real estate is referred to in the will, and extrinsic evidence is admissible and has been directed to prove that fact. Such evidence shows that the real estate referred to in the will, was the testator's paternal estate, and the will is therefore to be read as containing a specific devise of that estate. So reading the will—and in the absence of proof, that the testator owned or claimed any other real estate, at or after the date of the will—its true construction is, that the heir described is the party who at the testator's death intestate, would be capable of inheriting the real estate referred to in the will. The Harrisons alone, were so capable of inheriting that real estate, and, as the heir described, are alone entitled to the personal estate.

The fact that the testator was out of possession of his real estate at the date of his will and afterwards, has no bearing upon the case; inasmuch as the term "heir" is used in the will merely to describe the legatee of the personal estate, and that description is rendered just as certain by a reference to the course of descent of an estate of which the testator was out of possession, as it would have been by a reference to the course of descent of an estate of which the testator was in possession. Neither the state of the possession of that real estate, nor the condition of its title, at or after the date of the will, affect in any way the description of the heir of that estate, contained in the will; and as the condition of that real estate, in so far as regards the acts of the testator himself, was the same at his death as at the date of the will, there is no ground for any inference that the kind of heir to which the description pointed, at the date of the will (to wit, the party upon whom the law at the testator's death, intestate, would cast the inheritance of that land, as his heir,) at the date of the death no longer answered that description. In a word: By the devise of his real estate to his heir, the testator at his death described the heir of his estate, and did not describe a party who by no possibility could ever inherit that estate. This is the strict legal construction of the will, and all the extrinsic facts having a legal bearing upon the subject,

strengthen that construction: it being clear that it was the testator's idea that the heir of his confiscated real estate, as heir, had rights to that estate which he "could not lose;" and as the restitution of those rights was the absorbing object of the testator's life, at and after the date of the will, the bequest of the personal estate to that heir, would under such circumstances, be a disposition much more in accordance with the testator's views, than would a bequest of it to a party who never could be such heir.

These positions we fortify by authorities.

1st. By blending the personal estate with the real, the testator devised and bequeathed both to the heir of the real estate. In Gwynne v. Muddock, 14 Ves. 488, a testator gives "all my real and personal estate" to A. W. for life, "and my nighest heir-at-law to enjoy the same after her death." Upon the death of A. W., the next of kin of the testator claimed the personal estate, on the ground that the description "heir-at-law" must be considered with reference to the nature of the property; and therefore applied to personal estate, must mean the next of kin; according to the opinion expressed by Sir R. P. Arden, master of the rolls, (though not a decision) in Holloway v. Holloway, 5 Ves. 399. The master of the roll (Sir Wm. Grant,) after taking time to consider the case, gave his decision as follows: "I have not found any case directly applicable: but there is no doubt the heir-at-law, properly and technically speaking, may take personal property bequeathed to him by that description. It is always a question of intention what the testator means by the use of such a description. Where two descriptions of property are given together in one mass, then the difficulty arises, who is meant; for both the next of kin and the heir cannot take; unless this construction can be made reddendo singula singulis, that the next of kin shall take the personal estate; and the heir-at-law the real estate. But in this case the testator could not mean that; for he blends all the real and personal estate together; and after the death of Ann Williams, directs that his nighest heir-at-law shall enjoy the same. As both are to be enjoyed together, it is absolutely necessary for the court to say who shall enjoy both. It would be contrary to the intention to divide them; and it would be contrary to the words to give the whole to the next of kin. Therefore, the court has no alternative, but to adhere to the words of the will, and permit the person who answers the description of heir-at-law, to enjoy the whole." The decree accordingly declared the heirs-at-law were entitled to the capital, and the accumulation since the death of the tenant for life, Ann Williams.

In Mounsey v. Blamire, 4 Russ. 384, the language was, "to my heir £4000," and three co-heiresses of the testator were held to be entitled, Sir J. Leach, master of rolls, observing, "where the word is used not to denote succession, but to describe a legatee, and there is no context to explain it otherwise, there it seems to me to be a substitution of conjecture in the place of clear expression, if I am to depart from the natural and ordinary sense of the word heir." And see Davies v. Lowndes, 4 Bing. N. C. 478.

2nd. In order to ascertain the heir described, it is necessary to know what real estate the testator referred to in his will, and extrinsic evidence is admissible to prove that fact. It is an elementary rule, that extrinsic evidence is always admissible "in order to ascertain what is comprehended in the terms of a given description, referring to an extrinsic fact." 1 Jarm. Wills, 367, 370, and cases. It will be contended, that the terms of description here used ("my estate real,") are only applicable to real estate of which the testator was actually seised, or to which he had an indefeasible title; and that although evidence to identify such real estate may be admissible, yet no evidence can be received to show that the words used refer to real estate of which the testator had been disseised, or his title divested, but of which he still asserted himself the rightful owner. Now it is well settled in Pennsylvania, that land of which a testator is disseised at the date of the will, is still devisable. "Of the right of a testator to devise land of which he has been disseised," (Humes v. McFarlane, 4 Serg. & R. 435,) says Chief Justice Tilghman, in a Pennsylvania case, "I think there can be no question. The tenures attached to the feudal system never having prevailed in Pennsylvania, we have paid no regard to that principle of the English law, which requires seisin in order to authorize the alienation of land by deed or will. Our statute of wills, made in 1705, enacts that "all wills in writing whereby any lands, tenements, or hereditaments within this province have been, or shall be devised, being proved by two or more credible witnesses; &c., &c., shall be good and available in law for the granting, conveying, and assuring of the lands or tenements thereby given or devised." In another case, (Stoever v. Whitman, 6 Bin. 416,) it was made a question whether one out of possession could convey land by deed, and decided in the affirmative. The following is an extract of the opinion delivered by the court. "When deeds and devises of land have been considered by our courts, it has never been made a question whether the grantor or devisor was in or out of possession; and to make it now would be to disturb what has been looked upon as settled." In the case first cited, (Humes v. McFarlane,) the testator had devised in these words. "I also give and bequeath to my sons John and Alexander, all that my messuage or tenement wherein I now live," &c. It appeared that the

tract on which the testator lived had originally contained 200 acres, but that he had been dispossessed of part of it, containing 44 acres, under a recovery in ejectment by an adverse claimant, four years before the date of the will. The point was made, whether the testator's title to these 44 acres passed under the devise—and the court said, "The testator having devised 'all that messuage and tenement wherein he lived,' if the 44 acres now in dispute were at that time separated from the plantation on which he lived, and he did not keep up his claim, they would not pass by the will; but if he did keep up his claim they might pass. It was a question of intention, involving a fact on which the jury might decide. Whether an estate passes, is matter of law, but where that estate lies, or what is the extent of it, is fact." But again: The objection to the admissibility of this evidence rests wholly upon the assumption that the word "my," when used as a term of reference or description, is always to be construed in its strict and primary sense.

The answer to it is in the following extract from Mr. Wigram's Treatise on the Interpretation of Wills, (page 42:) "Proposition III. Where there is nothing in the context of a will, from which it is apparent that a testator has used the words in which he has expressed himself in any other than their strict and primary sense, but his words, so interpreted, are insensible with reference to extrinsic circumstances, a court of law may look at the extrinsic evidence of the case, to see whether the meaning of the words be sensible in any popular or secondary sense, of which, with reference to these circumstances, they are capable." This proposition is proved by the cases incidentally referred to in considering the second proposition. The most striking examples, perhaps, are those in which a popular or secondary interpretation has been put on the words child, son, my estate, and other similar cases. Thus the word child, though in strict construction it means a legitimate offspring, may be applied to an illegitimate offspring where the circumstances of the case make it impossible that the testator (who must have had some meaning) used it in such a strict and primary sense. Wilkinson v. Adam, 1 Ves. & B. 422; Woodhouselee v. Dalrymple, 2 Mer. 419; Beachcroft v. Beachcroft, 1 Mad. 430; Bayley v. Snelham, 1 Sim. & S. 78. So, son means an immediate descendant; where however, with reference to extrinsic facts, it is impossible that the word can have been used in such its proper sense, that construction of the word is of absolute necessity excluded; and the necessary inference that the testator used the word in some improper or inaccurate sense, lets in the inquiry in what sense the testator used it. Steede v. Berrier, 1 Freem. 292, 477; 8 Vin. Abr. p. 310, pl. 9. So, property subject to a power, is not, strictly speaking, his by whom the power is to be exercised. Now, suppose a testator having no real estate at the time of making his will, but having a power over the real estate of another, to devise his real estate over to A. Every devise of real estate being specific, the facts of such a case would exclude the presumption that the testator had used the word his in its proper sense, and would let in the secondary and only other interpretation of which the word under the circumstances is capable. Lewis v. Lewellyn, 1 Turn. & R. 104; Napier v. Napier, 1 Sim. 28; Sugd. Powers, c. 5, § 56, note.

3rd. The evidence shows that the real estate referred to in the will, was the testator's paternal estate. That real estate then, being that referred to in the will, it follows that we are to read the will as containing a specific devise of that real estate.

4th. Thus reading the will, and in the absence of proof, that the testator owned or claimed any other real estate at or after the date of the will, its true construction is, that the heir described is the party who, at the testator's death intestate, would be capable of inheriting the real estate referred to in the will. As a general rule, in every limitation of an estate of inheritance by a grantor or devisor to his own right heirs, heir-at-law, or lawful heir, the law construes those terms with reference to the descendible quality of the estate limited, and considers them as designating the heirs of the estate limited, in contradistinction to the heir general. Thus in limitations by deed by an heir ex parte materna, where the ultimate remainder is to the "right heirs" of the settlor, the term is construed to mean heirs ex parte materna. In an English case, Godbold v. Freestone, 3 Lev. 406, "A man seised of lands by descent ex parte materna, makes a feoffment of them to uses, viz., of Blackacre to the use of himself for life, the remainder to his wife for her life, the remainder to the heirs of his body on his wife begotten, the remainder to his right heirs. And of Whiteacre, to the use of himself for 99 years, if he so long lived, the remainder to trustees for his life, remainder to his wife for her life, remainder to his first, and so to his tenth son in tail, remainder to him and his heirs; the husband and wife are both dead without issue; and if the heirs ex parte paterna or ex parte materna should have the lands, was the question." Held that the remainder descended to the heirs of the feoffor ex parte materna, because the ancient fee remained in him. " 'Tis all one, be the use expressed or not; the word heirs shall be heirs of the same quality as before." In another English case, (Abbot v. Burton, 11 Mod. 181; 2 Cruise, Dig. 402,) A. being seised in right of his wife of lands which she had by descent on the part of her mother, the husband and wife by deed covenanted to levy a fine, which was thereby declared should be to the use of the conusees and their heirs, to make them tenants to the praecipe, in order to suf-

fer a common recovery; and afterwards such recovery was had accordingly; which, by the same deed, was declared should be to the use of the said A. for his life, and to his said wife for her life, and then to the first and every other son of their two bodies in tail male, remainder to the right heirs of the wife. A. and his wife died without issue; and the question was, whether the lands should descend to the heir of the wife on the part of the mother, or to her heir on the part of the father. Judgment was given in favour of the heir on the part of the mother. In a third English case, (Hutcheson v. Hammond, 3 Brown, Ch. 128,) F. W. having an estate by descent ex parte materna, on her marriage conveyed the same to trustees to such uses as she should by deed or will appoint: and in default of such appointment "to the only proper use of the right heirs of the said F. W., forever." By will, F. W. directed the estate to be sold, and inter alia, a legacy of £1000 to G. P., to be paid out of the proceeds. This legacy having lapsed by the death of G. P. during the life of the testatrix, it was held that it resulted as land unsold, and should go to the heir ex parte materna—per Buller, J. "The next question is, who is the heir-at-law entitled to take, the heir ex parte paterna, or ex parte materna. It is admitted the estate came to Frances Weeks, by descent from her mother; and the question is, whether the settlement upon her marriage, by giving the ultimate remainder to her right heirs, gave them a new estate as purchasers, or the old uses remain. I think it was the old use." On a rehearing before Lord Thurlow, he "gave a clear and decisive opinion against the claim of the heir ex parte paterna to the £1000." And see Harris v. Bishop of Lincoln, 2 P. Wms. 135; Watk. Des. p. 174.

That in a devise to the testator's own "heir-at-law," or "lawful heir," the heir described is the party who, but for the will, would have taken by descent the land devised, is one of the main points decided in the great case of Davies v. Lowndes, 4 Bing. N. C. 478, a case very similar to this. The testator, Selby, devised thus: "Next I give and devise to my right and lawful heir at law all my manors, &c., to hold the aforesaid manors to my heir-at-law," chargeable with certain legacies, to be paid by his said "heir-at-law," within twelve months after his decease. "But should it so happen that no heir-at-law is found, I then do hereby constitute and appoint William Lowndes, Esq., my lawful heir, on condition he change his name to Selby. And I give the estates and all the manors beforementioned, &c., to the said William Lowndes"—chargeable with the legacies. A part of the real estate thus devised had been purchased by the testator; part by his father, and part by his paternal grandfather.

It was held by the judges in the exchequer chamber, that the term right and lawful heir-at-law meant, "not any one who should be heir-at-law, but such heir-at-law as but for the will would have inherited the whole of the testator's property, whether purchased by himself, his father, or grandfather, and that no one can claim under the devise, who has not this qualification." Lord Mansfield in 1780, Lord Loughborough in 1782, and C. J. Tindal in 1835, had all taken this view of the subject, but had all gone one step further. Relying upon some expressions in the context of the will, they all expressed the opinion that the heir described must not only be able to take by descent all the property devised, but that he must also be of the blood of the Selbys. The point did not arise, and was not decided, in either of the cases before Lord Mansfield and Lord Loughborough. But it did arise, and was decided in the case tried before C. J. Tindal. That part of his decision (that the heir must be of the blood of the Selbys) was reversed in the exchequer chamber. But the doctrine, that the heir described must be capable of taking by descent all the property devised, was admitted by the distinguished counsel for the defendant (Sir W. Follett), and most strongly affirmed by the court. "The judgments of Lord Mansfield and Lord Loughborough, on the same will," says Sir W. Follett, "were relied on by the court below; but those judgments were given in cases in which neither of the claimants could be heir to the whole property. The reasoning of those judges only goes to show what is now admitted, that the heir whom the testator intended, was an heir who could take the whole; that he might be of the blood of the Selbys, but not that he must." "The cases of Doe v. Lowndes, [1 Bing. N. C. 620, 622,] in K. B. and C. P. (says Baron Parke, in delivering the opinion of the court), in the time of Lord Mansfield and Lord Loughborough, were naturally pressed on us in the argument. We entirely concur in the decisions then pronounced, and in the general reasoning on which they proceeded; but it was unnecessary there to decide the point now presented for judgment. The lessors of the plaintiff, in neither case satisfied the necessary requisites of the devise. They could not have inherited all the property. Upon a careful perusal of the language used by those distinguished judges, it will appear that the capability of taking all the property as heir was the leading principle on which they proceeded; and any expressions importing beyond this, that the heir must be of the Selby blood, were either used somewhat loosely, as being of equivalent import, or certainly they were extrajudicial." To apply this case to the one now under consideration. Suppose the whole estate devised by Mr. Selby had been derived by descent ex parte materna—and the plaintiff had been his heir general—but not of the blood of testator's mother, and therefore not capable of taking by inheritance the land devised? Accord-

ing to this decision, he would not have been the heir described—because the term right and lawful heir-at-law meant, "not any one who should be heir-at-law, but such heir-at-law as, but for the will, would have inherited the whole of the property" devised. "No one can claim under the devise who has not this qualification." This case therefore fully establishes the position, that when a testator devises his real estate to his right and lawful heir-at-law, the heir described must be able to take by descent the land devised—he must be of the blood of the purchasing ancestor—and otherwise will not take, even although he be heir general. There, the heir general would have taken by descent the lands which the testator had purchased; but inasmuch as he could not take by descent the other lands—as he could not make himself heir to the two other purchasers, testator's father and grandfather—he was excluded from the one estate which he could have inherited. So that instead of his character of heir general enabling him to take as a purchaser lands which he could not take by descent the mere possibility that there might be an heir who could take all three estates by descent, was sufficient to prevent his taking what he otherwise would have been entitled to by descent.

It is an elementary rule that "an heir-at-law is not to be disinherited without an express devise, or necessary implication." Yet by the construction contended for, the doubt, if there could be one, as to which of the senses the term heir is used in this will—heir general, or heir of the land devised—would be resolved so as to disinherit the heir. Apart from authority, the reason of the thing is wholly opposed to the construction claimed for the heir general. By such a construction, the testator is presumed, when in the act of devising his inheritance to his heir, not only to have no reference to the rules regulating the descent of the inheritance devised, but he is presumed to refer to the very opposite,—to the rules regulating the descent of some other inheritance, which he has not and does not devise. He gives his land to his heir; but by the construction contended for, the heir of that land shall not take it: he shall be excluded, in order that the heir general, who by law can by no possibility take the land devised, by inheritance, shall yet take it as heir!

5th. This exclusion of those not of the blood of the purchasing ancestor, has ever been a governing principle in the legislation of Pennsylvania. In the language of Mr. Justice Duncan, (Bevan v. Taylor, 7 Serg. & R. 400,) "it was the manifest and declared intention of the legislature to preserve the line of descent in the blood of the ancestor from whom the estate came, for ever and for ever." "To me it is clear intention written in capital letters in the act of 1794, and the explanatory act of 1797, that all who are not of the blood of the ancestor from whom the

estate came, are excluded from the inheritance; however remote in degree the descent may be, the lines in which the estate came, are preserved ad infinitum, and the blood of the ancestor runs through every clause of these acts." "In this and other parts of the act" says Yeates, J., (Shippen v. Izard, 1 Serg. & R. 226,) referring to the 7th section of the act of 1794, "sedulous attention is shown that the property shall not go out of the line of the father or mother who acquired it respectively."

6th. It now only remains to consider whether the fact that the testator was out of possession of his real estate, or that his title to it was defective, at, or after, the date of the will, has any bearing upon the construction which the law would otherwise give to the description of the legatee of the personal estate contained in this will. Neither of these facts has any bearing upon its construction. In every bequest of personal estate to the testator's "heir," the word heir is necessarily a mere term of description. Whatever may be the kind of heir described, whether heir general, or heir of particular lands, the legatee cannot take personalty as heir, for "a man by the common law cannot be heir to goods or chattels, for haeres dicitur ab haereditate." The question then arises, whether, when a legatee of personal estate is described in the will by terms which point either to the heir general, or to the heir of particular lands, as the case may be, it is of the essence of such description that the party referred to should actually inherit from the ancestor that real estate, his capacity for inheriting which, in ordinary parlance, constitutes him its heir? Now it is not true, either in legal or popular parlance, that there can be no heir when there is nothing to be inherited. A man's children and other kindred may be described or designated as heirs, whether they take anything from their ancestor or not. The principle upon which this rests is, that where the term heir is used to describe a legatee of personalty, the description is by reference, expressed or implied, to the course of descent, of some real estate, and not to its actual descent. Actual descent of the real estate so referred to, is not a condition implied in such description. The description is just as certain, and identifies the party referred to just as well, whether there is an actual descent or not.

Now if this be true where the terms of the description point to the heir general, upon what principle is it, that it is not true where the description points to the heir of particular lands?

The descriptions in both cases rest upon the same foundation. They in both cases refer to the course of a descent, not to an actual descent. In both cases the description remains the same, whether an actual descent takes place or not. If a testator should devise purchased lands and his personal estate to his heir, and before the date of the will,

should have been, or afterwards should be, divested by legal process both of the title and the possession of those lands, the heir of those lands would still take the personal estate, because he still answered the description. He is still the party referred to, although he has not actually inherited, either as regards possession or valid title, the real estate of which, had the testator died seised, he would have been the actual heir. So, if instead of being purchased lands, they had been derived by descent ex parte materna. The description points as certainly to the maternal heir in the one case, as to the heir general in the other. It is clear, therefore, that the law does not make the actual descent of the real estate which the testator has devised to his heir, a condition precedent, which must happen in order to enable such heir to take personal estate bequeathed to him by the description of heir of the real estate devised. It is admitted, however, that the testator may, if he chooses, make such actual descent of the essence of the description of the heir to whom he refers, and it now remains to consider whether he has done so in this case. And first it is to be observed, that if he has done so, then no one can under this will take the personal estate in controversy, because the actual descent has not occurred. The testator has, in such event, described a kind of heir who never had any existence, and who never could have any existence, unless the testator died seised of the land devised. It is next to be remarked, that the description in this will, is given with express reference to the course of descent of an estate of which the testator was then disseised. When, therefore, the testator directs that the course of descent of his estate, of which he is then disseised, shall designate his heir, is it not a most strained inference to presume that he intends that description shall be operative only in the event of his dying seised of that estate? His description had a meaning when it was given. That meaning was intended to have an operation the moment after the will was executed, if the testator had died at such moment; yet by the construction contended for, the testator is declared to have expressed a meaning which he knew was utterly insensible at the time he stated it—to have given a description of a legatee which he knew could have no operation if he died the next day, and which, although he retained it to the day of his death, he must all the while have known to be still inoperative?

To avoid the conclusions which thus result, the line of argument will have to be changed, and the position taken that this description must be construed as having been at the outset contingent. That it was intended to apply to the heir of the land devised, provided the testator recovered and died seised of that land, or at least, maintained a good title to it; but that otherwise, it was intended to apply to the heir general. This

proposition is not only unsupported by anything appearing on the face of the will, but is essentially opposed to the whole frame of it. Nothing can be more absolute and unconditional than the terms the testator has used. "My estate real and personal to my heir," twice repeated. The very basis of the whole devise, is an unqualified assertion of ownership of the real estate referred to. This assertion is made with full knowledge of the fact that that estate has been for ten years seized and confiscated—and it is made in distinct and utter disregard of that fact. The estate, he asserts, is still his. He will make it his for the purposes of his will. It is his estate, and all contingencies aside, it shall go to his heir—and not only so, but that heir shall have his personal estate. If the testator had been seised of the estate at the date of the will, and was afterwards disseised, there would have been even more foundation for the idea that the description was contingent, on the event of his dying so seised, than there is now. The very fact of his devising as he has done, the estate which had been torn away from him, is the fact of all others which shows the strength of his intention to make his assertion of his ownership to that estate, for all the purposes of his will, and free from all contingencies, equivalent to actual ownership. It is wholly immaterial therefore, what was the condition of the title of the testator, to the real estate devised, either at the date of the will, or at his death. All, perhaps, that is necessary to be known upon that subject is, that he never aliened it. He continued pertinaciously to claim it till the day of his death, and entertained the hope that his heirs, if not himself would some day regain it. But if it were not so the result would be the same. The testator's description remains unchanged: the law repeats it for him in articulo mortis: and its effect, at his death, in identifying the heir of his land, is precisely that which it was originally framed to accomplish.

Finally: The situation of the testator before, at, and after the date of the will, with reference to the real estate devised, shows that his actual intention in this will was to make the party who at his death would be the heir of his paternal real estate, the legatee of his personal estate. The evidence upon the question of domicil given in the case of White v. Brown, [Case No. 17,538,] exhibits the whole story of the testator's life, as told by himself, with a minuteness of detail seldom met with. In his estimation the greatest event of his life was the wrong he had suffered by the confiscation of his real estate. He always entertained the most firm conviction of the absolute illegality as well as gross injustice of that confiscation; and he appears to have been impressed with the idea that the heir of that estate had rights to that real estate which he "could not lose." Under such circumstances this will was

made; and it is probably to some such notion as to the superior right, or chance of success, that the heir of his real estate might have to its recovery, coupled with his own determination to leave no means in his power unused, to enable that heir to enforce his rights to that estate, that the present will owes its existence. It is clear from the whole frame of it, that the testator personally cared not who was to enjoy his large personal estate; otherwise he never would have designated his legatee by a description which, under every possible construction of it, left the particular individuals who were to take under it, of necessity a matter of uncertainty until the day of his death. He cared not even as to the class of persons to which that description would apply at his death; for that class was changed by the intestate act of 1794, and yet he made no change in his will in consequence of it. What he did care for was, that the party who would be the lawful heir of his real estate—that confiscated estate which was still his—should have the means to enforce those rights to it which as heir "he could not lose"—that such heir after the testator's death should be enabled to carry out the one absorbing idea of the testator's life. This was his intention at the date of the will; and as the foundation of it—the sense of the injustice he had suffered by the confiscation—became stronger by lapse of time —there is every reason to believe that such intention remained in full force at his death. There is every probability, therefore, that from first to last the testator actually intended to describe the kind of heir which the law says he has described; that his intention and his words both point in the same direction. Both are satisfied by the construction which gives his personal estate to the heir of his land—both are violated by that which gives it to a party who is not, and never could be, such heir.

In reply. I. The repeal of the 11th section of the act of 1794. There is nothing in the section of the new act contrary, either in terms or in spirit, to what is provided in the omitted clause of the old act. The new act declares itself to be supplemental to the old act, and remedial of defects in it; and where it means to repeal a section, it repeals it expressly. In the well-argued and well-considered Pennsylvania case of Bevan v. Taylor, 7 Serg. & R. 403, the court held the two acts as forming "a scheme of descents" in Pennsylvania; and a declaration in the 7th section and the 11th section of the last act, I incorporate, said the judge who gave the opinion of the court, into the whole system; for different statutes made at different times, are to be explanatory of and construed into each other; as in the construction of the statute of distributions 22 & 23 Car. II. c. 14; and St. 1 Jac. II. c. 16.

II. Supposing the 11th section unrepealed,

what is meant in the will by "heir-at-law?" It means heir by statute law. The question of domicil is unimportant, as the testator had the laws of Pennsylvania in view, when using the terms "heir-at-law," and "lawful heir." For the real estate referred to in the will—if any is referred to anywhere—is situate in Pennsylvania; since, at and after the date of the will, the testator neither owned nor claimed any other, and always did claim that. By his devise of that real estate to his heir-at-law, the testator necessarily referred to the law which, at his death intestate, would regulate the descent of that real estate; and the only law which could so regulate that descent, was the law of Pennsylvania, where the estate was situate. By blending the personal estate with the devise of the real, he designed it also to go to the heir of that real estate; and therefore in the bequest of the personal estate, the testator referred expressly to the law of Pennsylvania, which, at his death intestate, would designate the heir of his real estate, as designating also the legatee of his personal estate. In this case, therefore, while the testator's domicil, at and after the date of the will, was in Pennsylvania, we are yet relieved from the necessity of relying exclusively upon that position, by the facts that the will was made in Pennsylvania,—by a native of Pennsylvania,—devising real estate in Pennsylvania and not elsewhere,—and bequeathing personal estate to the heir of that real estate; that the will was executed so as to pass only real estate in Pennsylvania, with Pennsylvania executors, one of whom was to be the president, at "the time being," of the testator's death, of a bank in Pennsylvania; and that the will, from its date to the testator's death, was deposited in Pennsylvania; all of which circumstances render it manifest that whatever might be the testator's domicil, at or after the date of the will, he yet had in his view, when he made the will, only the laws of Pennsylvania.

The words "heir-at-law," as used in this will, are not in Pennsylvania a technical expression, meaning "heir at common law." No authority has been cited which in any degree sustains the position that the words in question ever had in Pennsylvania, when used as in this will, the technical signification claimed for them. If there is any word in the language of the law, whose precise meaning should be considered as fixed, it is the term "heir;" and just in proportion to the precision heretofore attached to its signification should be the strength of the authority adduced to show that the signification has changed. A brief examination of the references cited on the other side, will show that that position cannot be sustained. The point they have to prove is, that in a naked devise to a testator's own "heir-at-law," those words, in Pennsylvania, mean "heir at common law." The proof they adduce is, That from the date of this will, until after the testator's

death, the canons of descent, established by the common law of England, were adopted in Pennsylvania, in all cases where they were not abrogated by statute, so that in such cases there was an heir, who was "heir at common law." That this heir at common law was sometimes, in the language of legislators, judges, and lawyers, termed "heir-at-law, and that, therefore, those words when used nakedly in a will, must mean "heir at common law."

1st. Let us examine the language of the legislation cited. The words of the act of 1705 relied on, are as follows: "But if the intestate leaves a widow and no child, then such widow or relict shall inherit one moiety or half part of the said lands and tenements, and the other moiety shall descend and come to the intestate's next heir according to the course of the common law. But if the intestate leaves no widow nor child living at the time of his death, or if the children all die in their minority, without issue, then the said lands and tenements shall descend and come to the intestate's heir-at-law, according to the course aforesaid." It will be perceived that the language of this act, instead of supporting the position in question, is directly opposed to it. Instead of deeming the phrase "heir-at-law" sufficiently precise to designate the heir at common law, the legislature first describe him by the words "next heir, according to the course of the common law," and afterwards when they do use the words "heir-at-law," carefully subjoin the words "according to the course aforesaid." The words of the supplemental act of 1764, also cited, are as follows: "But where the wife is living, and the whole premises shall be adjudged and ordered to the heir at law or any other of the children, the wife of the person so deceased shall not be entitled to the sum at which the purpart or share of her estate, so as aforesaid ordered to her heir at law or any of the children, shall be valued, but the same, together with the interest thereof, shall be and remain charged upon the premises, and the interest thereof shall be regularly and annually paid by the heir at law or such other child to whom the same shall be adjudged," &c. "And at the decease of the said mother the said principal sum, so as aforesaid valued and adjudged shall be paid by the said heir at law or other child aforesaid, to whom the same shall be adjudged," &c. In this act, the words "heir-at-law" are throughout used as synonymous with eldest son. They do not refer to the heir at common law, taking as such heir, but are loosely and inaccurately used to distinguish the eldest son from his brothers and sisters. [Walton v. Willis,] 1 Dall. [1 U. S.] 265, 353. If such inaccurate phraseology proved anything in relation to the meaning of the words "heir-at-law," considered as a technical term, it would prove that they meant eldest son, and nothing else. A nephew of the intestate, although he might be heir at common law, does not come under the description of "heir-at-law," as the words are used in this act. They are, therefore, clearly not synonymous with "heir at common law.'"

2. The language of judicial opinions is next to be considered. In Johnson v. Haines' Lessee, 4 Dall. [4 U. S.] 65, the question was, whether a particular case of intestacy was a casus omissus in the intestate laws of Pennsylvania. The reporter, and Chief Justice M'Kean, when speaking of the plaintiff, use the terms "heir-at-law," and "heir at common law," indiscriminately. It is to be remarked, however, that in every instance where the term "heir-at-law" is used in this case, the context shows clearly that the heir at common law is referred to; whence it is evident that the term "heir-at-law" is used merely as an abbreviation of the term "heir at common law," where, from the context, there is no possibility of mistaking the meaning of the term. In Walton v. Willis, 1 Dall. [1 U. S.] 353, Chief Justice M'Kean, when speaking of the intestate acts then in force, says, "The main intent of these acts appears to have been, that real estates should be divided among the children, or representatives in the descending line of an intestate; and not descend to the heir at common law:" thus describing such heir in terms which are unmistakable. So, in an anonymous case, decided in 1774, reported in 3 Smith's Laws, 160, [note.] "Question, whether his heirs at common law shall take, or it shall divide among his other brothers and sisters under the supplemental intestate law?" Opposed to the casual expressions, loosely used and always in association with such precise language as prevents their misinterpretation, is Ruston v. Ruston, 2 Yeates, 54, an authority in point to show that the term "heir-at-law," has no such technical signification attached to it, as is here contended for. A question in that case was, whether a proviso, in a devise of land (by a will dated in 1784) to the eldest son, directing the payment of a sum of money, was a condition. M'Kean, C. J., said, "The defendant could not be considered in this case as heir-at-law in Pennsylvania, where, if at that time a person had died intestate, leaving divers children, his real estate would have descended to all his children equally, the eldest son having only a double portion or share, and therefore the devise may even be considered as a condition." Yeates, J., "But it is objected that the proviso in the will does not form such a condition as will warrant an entry on its breach, the defendant being the eldest son and heir-at-law under English ideas." And Smith, J., "When an ancestor leaves more children than one, the term 'heir-at-law' conveys no idea with us; they are all his co-heirs. All are equally entitled, if he dies intestate." See, also, French v. McIlhenny, 2 Bin. 20; Crosby v. Davis, 4 Pa. Law J. 193.

If the term "heir-at-law" had the technical meaning claimed, in 1791, it has it at this day. The intestate act of 1833 in no way affects the meaning of the words "heir-at-law," as used in a will. It merely excludes the heir at common law in cases of intestacy, where there are nearer of kin. No one will contend, that if a testator in Pennsylvania were now to devise his real estate to his "next heir according to the course of the common law of England," the devise would fail because of the exclusion of such heir in a case of intestacy by the act of 1833. The devisee would still take, under the description given by reference to an ascertained course of descent; and if the heir at common law, as the party described, would take under such description, so also would he take under any other description which identified him equally well. By the argument submitted on behalf of the Aspdens, in this case, the term "heir-at-law" is such a description. It means "heir at common law," in a will in 1852, just as much as it did in 1791. Yet will any one contend that if a testator in Pennsylvania should, at this day, devise all his estate, real and personal, to his "heir-at-law," and should die leaving many children, the eldest son alone would take, to the exclusion of his brothers and sisters? The argument, to be worth anything, must go to that extent. It must go to the extent of saying, that if the testator, Matthias Aspden, had, after the date of this will, married and had numerous children, and had then republished this will, his eldest son alone, as "heir-at-law," that is, it is said, "heir according to the course of the common law," would have taken everything, and his brothers and sisters nothing; and that such a will made at this day, would have a similar operation. It is said, however, that the words here used must be construed to mean heir at common law, because "the testator did not intend his estate to be divided: it was to go to one person, hence he uses the singular number." To this, the answer is conclusive, that it is perfectly well settled, the term heir is "nomen collectivum." Gwynne v. Muddock, 14 Ves. 488; Mounsey v. Blamire, 4 Russ. 384; George v. Morgan, 4 Harris, [16 Pa. St.] 108. In this case, if the party claiming as heir at common law, John Aspden, had died before the testator, leaving daughters only: no one will say that the daughters, however numerous they might be, would not collectively be the heir at common law. Co-parceners are but one heir, "They be but one heir, and yet several persons." Again, no person can take under this will unless he is clothed with the character of heir-at-law; and if he takes in that character, he must take in that quality, as the heir of the testator, by lawful descent to his real estate, as the person whom he has designated as the heir to whom his whole estate shall go as one entire fund. The rules of law put it out of the power of a testator to make his own right heir, or his heir-at-law, a word of purchase to break the course of descent; not because he may not do it by words denoting such intention, but because such intention cannot be legally inferred from the mere use of the term. Yet by the doctrine contended for, the heir at common law shall take as a purchaser, under the description of "heir-at-law," although he is unable to take by descent. He takes by force of the "technical expression," alleged to designate him; and as "heir-at-law" is to take away the inheritance devised, from the only party who by the law of the land is capable of taking that inheritance as heir.'

An isolated extract from the opinion of the court in the Pennsylvania case of George v. Morgan, [supra,] has been cited as authority for the general proposition that "in Pennsylvania a testator is to be considered as speaking in reference to the common law system of descents." But the extract in connection with its context, shows that the expression used has no such unlimited application as appears to be attributed to it. In that case, the testator, in 1744, devised an estate to his son Mordecai, "to hold to him for and during his natural life, and after his decease to the heirs of his body lawfully begotten, and to their heirs forever, and in default of such issue then to the heirs of my son Samuel and their heirs forever," and the question was whether Mordecai took an estate tail under the rule in Shelley's case. The passage in the opinion of Bell, J. above referred to, is as follows: "But it is urged upon us that as, in England, an intention to change the line of descent is sufficiently manifested wherever the superadded words import eventual distribution of the estate among several, as if it be limited over as a tenancy in common, or to be divided equally among all the heirs of the first taker,—in Pennsylvania since the abolition of the rights of primogeniture, such a devise as we have here must be taken as changing the descent; the superadded words and 'to their heirs forever,' necessarily importing not the heir in tail, who is generally the right heir in England, but all the lineal descendants of the praepositus, who take as parceners with us under the general title of heir. I confess, I was much struck with the view when it was first presented, and very much inclined to adopt it as consistent with reason. But further reflection has satisfied us that it is inadmissible. In the first place, it frequently happens that, even in England, the right heirs of a devisor may be of persons entirely different from him who would alone take as heir in tail, and yet it has always been there held as essential, that to withdraw the devise from the power of the rule, distribution must be expressly contemplated, and shown to be so by some precise direction. Secondly, though in Findlay v. Riddle, 3 Binn. 139, Yeates, J., seemed much inclined to adopt the idea that, with us, a limitation

to heirs general always imports distribution, and is therefore repugnant to the rule in Shelley's case, it was not received in our subsequent cases, though expressly urged upon the attention of the court, where full scope was afforded for its operation, had it been thought tenable. In the last case of Hileman v. Bouslaugh, [13 Pa. St. 344,] the reasoning of the chief justice is in direct repudiation of it. All this is conclusive that, in this state, a testator is to be regarded as speaking in reference to the common law system of descent."

Thus far the case has been considered as if it turned solely upon the construction of the term "heir at law." The testator however has in a subsequent clause of the will used the words "lawful heir" in a repetition of the original devise of his estate real and personal. It cannot be pretended that any one, in this commonwealth, when speaking of his "lawful heir," refers to that person who would inherit according to the law of a distant country; or that, like the phrase "heir-at-law," it has been used in any special, or professionally accurate sense, as an equivalent or abbreviation of the more correct expression, "heir at common law," or "next heir according to the course of the common law." The exact term 'lawful heir' is used in the statute of 1705, to designate that person, or those persons to whom that statute gives the estate. Speaking of escheats of real estate in default of any "known kindred," it says:_ But "if the lawful heir to any such lands or tenements shall at any time appear, he shall have them," &c. This clearly means the persons to whom, on the owner's death, that statute gives them, and it entirely changed the common law canon of descent. 3 Smith's Laws, p. 158; section 13, Act 1705. In State v. Engle, 21 N. J. Law, 347, 361, 367, it is said that "the words lawful heir must be understood to mean an heir capable of inheriting the lands in question under the laws of New Jersey." In a Pennsylvania case, (Simpson v. Hall, 4 Serg. & R. 337. And see Hart v. Gregg, 10 Watts, 190,) a brother of the half blood is called 'heir.'

III. The terms "heir-at-law," and "lawful heir," as used in this will, designate the person or persons on whom the law of Pennsylvania at the testator's death, would cast the inheritance of the real estate referred to in the will, as his lawful heir, provided he had died intestate. The general rule, that in a devise to the testator's own heir, the term heir must be construed to apply to the person or persons answering the description at the testator's death, is unquestioned. In such a case the maxim "nemo est haeres viventis," emphatically applies. 2 Jarm. Wills, 28. That the view of the testator was prospective in fact, is evident, for he declares that his estate shall go to the party who would be his lawful heir in case there might be no doubt of his own legitimacy. That

doubt could only arise after his death. As matter of law also, as well as of actual intention, the law of descent which is to designate the heir referred to in this will, is the law in force at the testator's death, and not in force at the date of the will. From the very nature of a devise to a testator's own heir, it is plain that every such testator must contemplate two classes of contingencies.

1. The person or persons answering the description may change, by births or deaths, from hour to hour.

2. The laws regulating the course of descent, like all other laws, are liable to change.

In regard to the first class of contingencies, it is not pretended that it is not, as matter of law, within the purview of such a testator. In this very case, the party who was the heir at common law, at the date of the will, died before the testator; yet no one doubts that the present claimant, the son of that party, at the date of the testator's death, answered the description of the testator's heir at common law, although he did not do so at the date of the will. So also, as to changes in the law of descent. A testator when devising to his own heir, ex vi termini, refers to the period of his own death, as that whereat his heir is to be ascertained. He has such period in his actual, as well as legal, contemplation, when making such devise: and as it is then, and then only, that his heir can be ascertained,— and such heir can only be ascertained by the law then in force—it follows that that law, whatever it may be, is the rule which the testator declares it his intention to adopt as part of his will.

This doctrine in no degree conflicts with the general proposition that "the intent of the testator ought always to be taken as things stood at the time of making his will, and is not to be collected from subsequent accidents which the testator could not then foresee;" for in the case of a devise to his own heir, his intention at the date of the will is prospective in its character; it actually looks at the period of his death, as that before which the law cannot operate to define his heir. It does not follow therefore, that because the law of descent changes after the date of the will, in which a testator has devised to his heir, we are to impute an actual change of intention to the testator, and presume that he actually adopts the law as changed. He has relieved us from the necessity of speculating upon such a question, by declaring in advance, that the law in force at his death, is that which is to define his heir. The changes in the law of descent, after the date of such a will, however frequent and however great, affect in no degree his legal intention. Whenever he dies, his heir will still take. The law throughout all its changes, will still carry out his intention, and give the estate to his heir.

All the cases cited on the other side, there-

fore, to the effect that after-purchased lands would not pass at the date of this will, and that devises to classes of individuals in existence at the date of a will, cannot be construed to apply to individuals of the class referred to, who came into existence after the date of the will,—have no application in a case where the devise is in its nature prospective, and looks to the period of the testator's death. Martindale v. Warner, 15 Pa. St. 479, cited as "authoritatively settling" the point now in question, it is submitted, has no bearing on it whatever. In that case a testator, in 1828, bequeathed certain legacies to several of his brothers, nephews and nieces, naming each of them, and died in 1849. Several of the legatees died before the testator—some before, and others after the passage of an act of May 6, 1844, hereafter mentioned—leaving issue; and the question was whether the legacies to those persons lapsed, or whether the issue of such legatees were entitled thereto, under the provisions of the act referred to. The words of the act are as follows:—"No devise or legacy, hereafter made, in favour of a brother or sister, or the children of a deceased brother or sister of any testator, such testator not leaving any lineal descendants, shall be deemed or held to lapse or become void, by reason of the decease of such devisee or legatee in the lifetime of the testator, if such devisee or legatee shall leave issue surviving the testator; but such devise or legacy shall be good and available in favour of such surviving issue, with like effect, as if such devisee or legatee had survived the testator, saving always to every testator the right to direct otherwise." It was held that this act did not operate upon the will in question, because it was obvious by the words "devise or legacy hereafter made," that no retrospective effect was intended to be given to it, and that, such being the case, "that the testator permitted his will to stand without alteration for several years, or that he may have known of the act of 1844 is nothing."

IV. The expression first paying, and the provision for the half blood, is too feeble to control any but an ambiguous expression. We have shown that the term heir-at-law, explained by the term 'lawful heir,' points plainly and fixedly to certain persons who are constantly changing, who are left perfectly uncertain till the testator's death; and are then determined easily, clearly, and unchangeably. The fact that in the course and changes of thirty or forty years these persons happen to fall within some other provision of the testator's bounty, is not enough to unsettle the legal definition of the clearest and best defined term of the law.

V. Extrinsic evidence is inadmissible to show that the testator used the words "heir-at-law," or "lawful heir," in a peculiar sense of his own, differing from their legal signification.

The law upon this subject is embodied by Mr. Wigram on Wills, (page 17,) in a general proposition laid down by him. "When there is nothing in the context of a will, from which it is apparent that a testator has used the words in which he has expressed himself in any other than their strict and primary sense, and where his words so interpreted, are sensible with reference to extrinsic circumstances, it is an inflexible rule of construction, that the words of the will shall be interpreted in their strict and primary sense, and in no other, although they may be capable of some popular or secondary interpretation, and although the most conclusive evidence of intention to use them in such popular or secondary sense, be tendered." Delmare v. Robello, 1 Ves. Jr. 412; Hampshire v. Pierce, 2 Ves. Sr. 216. In Mounsey v. Blamire, 4 Russ. 384, the testatrix gave the sum of £4000 "to her heir." Evidence was tendered to prove that the person intended by the testatrix was an individual (a stranger) whom she had promised to make her heir, and whom she used to call her heir. The heir at law claimed the legacy. The master of the rolls decreed the legacy to the heir-at-law.

VI. Argument for the maternal half blood. Supposing all the foregoing arguments to be insufficient, then the case of the heir at common law is disposed of against him. And the new question arises; the one between the half blood itself. To which side of the half blood, or how amongst them does the estate go? Does it go to the paternal side alone, or to the maternal in connexion with it? We contend that it goes to both.

1. This will, in fact and in law, is a will of personal estate alone, and not of real estate, because the testator had no real estate to devise at the time of making his will, nor had he any at any period afterwards, up to the day of his death. The case resembles those cases in which it has been held that a will of real and personal estate is revoked pro tanto, as to real estate, by its alienation subsequently to the date of the will; and becomes a will of personalty alone. Thus in a Massachusetts case, (Brown v. Thorndike, 15 Pick. 388, A. D. 1834,) the language was, "all the residue of my estate, real and personal." But the testator afterwards aliened the only real estate he had at the time of making the will: and this, on a question of probate, was held to be a revocation pro tanto, and that the will became a will of personal estate simply. Evidence extrinsic to the will was held necessarily admissible to show the alienation of the real estate whereby the will had become a will of personal estate only. After speaking of the object of the law in excluding parol testimony generally, as being to prevent the intention of the testator being defeated, Shaw, C. J., says, what is certainly true as a fact, and will explain the testator Aspden's devise of real estate, he having no estate of that sort: "It is usual, in wills as well as in other instru-

ments, to use broad and general language large enough to embrace every species of property, although there are but few species of property in the mind of the testator or in his power to bequeath, upon the safe maxim that "omne majus continet in se minus;" as "all my estate of every name and nature;" "all my property wherever, &c." And see Very v. Very, 3 Pick. 374, and Hilliard v. Binford, 10 Ala. 977. Now, the will being one of personalty merely, the term 'heir' is to be considered in reference to its subject-matter, and means next of kin; who are in this case, it may be observed, the same persons as the heirs general. In Holloway v. Holloway, 5 Ves. 403, where there was a bequest of money to "heirs-at-law," these heirs, at the testator's death, being there also, as in this case, the next of kin, the master of the rolls, Sir R. P. Arden, says: "This is personal property; and it is said that though 'heirs, &c.,' have a definite sense as to real estate, yet as to personal estate it must mean such person as the law points out to succeed to personal property. I am much inclined to think so. If personal property were given to a man and his heirs, it would go to his executors. I rather think if I was under the necessity of deciding this point, I must hold it heirs quoad the property; that is, next of kin. . . . Great difficulties would arise from the construction that heirs-at-law are intended, and applying it to personal property. He might have different heirs-at-law; heirs descending from himself as first purchaser; heirs ex parte paterna and ex parte materna. I am inclined to think the court would in such a case consider him as the first purchaser, so as to take in both lines. However, there is no occasion to say anything upon that." This view is supported by other cases. Vaux v. Henderson, 1 Jac. & W. 388; Gittings v. McDermott, 2 Mylne & K. 69; Evans v. Salt, 6 Beav. 266; Eddings v. Long, 10 Ala. 203.

2. But if this be not so, still real estate which did not belong to the testator at all—estate which was not his—cannot direct the course of this personalty. The words are "my real estate." Now that alone is 'mine' which is not owned by any body else. What I claim, is not necessarily mine; nor even what I believe to be mine. The argument of the Harrison counsel recalls Lord Harwicke's language, when speaking in parliament upon the bill to indemnify witnesses who should give evidence against Sir Robert Walpole, and offering a reward for evidence without assertion of any corpus delicti. 'But, says a noble lord,' replies Lord Hardwicke, sarcastically, 'if we have not here a corpus delicti, we have what is sufficient for the purpose, a corpus suspicionis; a new expression and a new invention, the body of a shadow, and on this foundation he calls upon you to build his new superstructure of injustice.' Camp. Lives Ld. Ch. p. 94. The Harrison counsel seek to change a natural and primary con-

struction of the will, not by showing any real estate which either did or might, could, would, should, or ought to pass by the will, but by showing his unfounded and absurd belief—his delusion—that he owned, or ought to own, some such estate. Such a belief or delusion has never been regarded as real estate, except that kind known as chateaux en Espagne, by any court anywhere. "In expounding a will," says Mr. Wigram, (Wig. Wills, 8,) "the court is to ascertain not what the testator actually intended as contradistinguished from what his words mean, but what is the meaning of the words he used. And certainly in a will so simple as this, calling for no forced construction, 'my' can never be converted into 'his.'

3. All this belief, too, is sought to be proved by the testator's declarations extrinsic to the will. No doubt you may and must resort to extrinsic evidence to show whether or not the testator had or had not real estate. But, then, this is simply a fact, and this case states that it is shown by such evidence that he owned no such estate. The Harrison counsel now attempt to contradict this fact, and to prove this imaginary subject-matter by the testator's ridiculous declarations. This cannot be done. The declarations of a testator prior to or cotemporaneous with, or subsequent to the making of his will, are inadmissible, and cannot be received to prove his intention; not even the instructions given for the will. 1 Jarm. Wills, 353. Nor even an express declaration made at the time, of what his intention was, (Wig. Wills, pl. 104;) and this although no doubt may exist in the mind of the court that such was the actual intention of the testator. To the same purport are our American authorities. "The legal construction of a will in writing," say the court, in Comfort v. Mather, 2 Watts & S. 453, "cannot be explained or altered by the parol declarations of the testator, of his understanding of the meaning of the will, or of his intentions to do something else. So in Lewis v. Lewis, 2 Watts & S. 455; (and see Asay v. Hoover, 5 Pa. St. 21; Trustees v. Sturgeon, 9 Pa. St. 321; Farrar v. Ayres, 5 Pick. 404; Brown v. Saltonstall, 3 Metc. [Mass.] 423,) "where parol declarations made by the testator as to his intention of dying intestate, whether before or after the making of the will, are not admissible to show a revocation of it." The only exception to this is of declarations of the testator to prove a material fact collateral to the question of intention, where such fact would go in aid of the interpretation of the testator's words. These cases, however, will be found to be those only in which the description in the will is unambiguous to any one of several subjects. See cases cited 1 Greenl. Ev. pp. 373–376; 1 Spence, Eq. Jur. 560; Wig. Wills, pl. 104, p. 81; and Id. pls. 194, 195.

GRIER, Circuit Justice. This case has been learnedly, laboriously and on some points

very ably argued, and we congratulate the parties and the counsel that, after twenty-two years of litigation, there is now a prospect that, in three or four years at farthest, those who are entitled to the large estate in suit, will be permitted to enjoy it, and that those who are not, will cease to indulge in vain hopes respecting it.

The first question for our decision, is whether the 11th section of the act of 1794 has been repealed by the 7th section of the act of 4th April, 1797. If so, then all other parts are unimportant. Let us inquire what are the principles laid down by the sages of the law to govern questions like the present.

1st. "An act of parliament may be repealed by the express words of a subsequent statute, or by implication."

2nd. "If a subsequent statute contrary to a former have negative words, it shall be a repeal of the former act."

3rd. "Every affirmative statute is a repeal by implication of a precedent affirmative statute, so far as it is contrary thereto; for 'leges posteriores priores contrarias abrogant.'"

4th. "A later act has never been construed to repeal a former act, unless there be a contrariety or repugnance in them, or at least some notice taken of the former act, so as to indicate an intention in the law-giver to repeal it." The law does not favour a repeal by implication unless the repugnance is quite plain. Dore v. Gray, 2 Term R. 365. Also, when two acts are seemingly repugnant, yet if there be no clause of non obstante in the latter, they shall, if possible, have such construction that the latter may not be a repeal of the former by implication. [Foster's Case,] 11 Reports, [Coke,] 63.

To come to the case before us. The act of 4th April, 1797, was made, says Chief Justice Tilghman, (Cresoe v. Laidley, 2 Bin. 286,) for the express purpose of supplying the defects of the act of 19th April, 1794. The latter act purports to be a supplement to the former. The 5th section, where the cases omitted in the former act, and intended to be supplied, are commenced, has this preamble: "Whereas the provisions of the act to which this is a supplement, appear to be incomplete," &c., and proceeds in that and the following sections, to supply certain casus omissos of the act of 1794, and ends the last section in these words: "and that the second section of the act to which this is supplementary, be, and the same is hereby repealed." Now the legislature have declared, in express terms, that they repeal the 2nd section of the act of 1794 only. There is, therefore, no express repeal of the 11th section. There is no provision in the latter law, which negatives any provision of the 11th section of the former. The issue of the half-blood shall inherit, says the former, in preference to more remote kindred of the whole blood, and there is not a syllable in the last act, which is contrary to this provision of the first. There is no repugnancy between them. The latter was made to supply omissions of the former, and yet, without directly repealing the 11th section, it is contended that the 7th section of the latter act creates a casus omissus by implication, because it omitted to re-enact what already had been provided for in the 11th section of the first act.

In the case of Bevan v. Taylor, 7 Serg. & R. 403, cited at the bar, the supreme court of Pennsylvania declared that the act of 1794, and its supplement of 1797, should be construed as one act. The 11th section of the former applies only to the inheritance of real property, and the 12th section, which appears to include both real and personal, provides for the issue of brothers and sisters of whole and half-blood only by implication, or negative pregnant, and wholly omits the case where there are both. The 7th section supplies this oversight or omission; first, in case there are brothers and sisters, or their representatives, both of the whole and half-blood; and, secondly, provides for the distribution of the personalty when there were no brothers or sisters of the whole blood, but brothers and sisters of the half-blood; but, in supplying this omission, it unnecessarily included the inheritance of the realty, which had already been provided for in the 11th section of the original act; and, moreover, neglected to include the issue of the half-blood, which still remained a casus omissus as regards the personalty, by the omission of the words or "their lawful issue," in the supplement. Construing this act of 1794, with its supplement of 1797, as one act, we have, then, this case: a latter section unnecessarily repeats some of the provisions of the former section, and omits others. This omission does not, I think, amount to a repeal of what is not repeated.

II. As to the meaning of the term, in Pennsylvania, 'heir-at-law.' The language of some of our statutes, as well as that of eminent lawyers belonging to the bar and bench, do seem undoubtedly to favour the argument of John Aspden's counsel; that the term has been generally used in Pennsylvania, to designate the heir at common law. Let us however look at this matter further. By the charter granted to Mr. Penn, the laws of England "for regulating and governing of property, as well as for the enjoyment of lands and succession of goods and chattels," were introduced and established in Pennsylvania, to continue till they were altered by the legislature of the province. But the canons of descent of the common law were soon changed; and as early as 1683 it was enacted "that the estate of an intestate shall go to his wife and child or children, and if he leave no wife, child, or children, it shall go to his brothers and sisters, if any there be," &c., &c. Afterwards the act of 1705 gave the eldest son a double share. But, without attempting to

give a history of the legislation on this subject, it may suffice for the present to say that, although the policy of her legislation was to distribute the estate of an intestate equally amongst the next of kin, no attempt was made to provide a complete canon of descents and distribution till 1794. This act was soon found to have many omissions, and was further amended by a supplement in 1797. In the meanwhile the courts construed these acts strictly, giving the inheritance to the heir at common law in all cases where a contrary direction was not given to it by the plain words of the statute. Johnson v. Haines' Lessee, 4 Dall. [4 U. S.] 64; Cresoe v. Laidley, 2 Bin. 279; Jenks' Lessee v. Backhouse, 1 Bin. 91. The common law of England, as governing cases not specially provided for by statute, was never totally abolished till the revised code of 1833 was adopted. Hence, the language and phraseology of the English courts continued to be used in the courts of Pennsylvania, sometimes, perhaps, without regard to proper distinction or absolute correctness of diction; and here, as there, the term "heir-at-law" was not unfrequently used as an abbreviation, substitute, or equivalent for the expression "heir at common law."

In section 8, of the act "For the Better Settling of Intestate's Estates," passed in 1705, (3 Smith's Laws, 156,) the heir at common law is described with accuracy as "the next heir according to the course of the common law." But in the supplement to that act, passed in 1764, (Id. 160,) and in section 4 of the principal act, the phrase "heir-at-law" is somewhat inaccurately used to distinguish the elder son from his brothers and sisters. In Johnson v. Haines' Lessee, 4 Dall. [4 U. S.] 65, Chief Justice M'Kean uses the expressions "heir-at-law" and "heir at common law" indiscriminately to designate the same person. In the cases of Jenks' Lessee v. Backhouse, 1 Bin. 91, and Cresoe v. Laidley, 2 Bin. 279, reported in the volumes of Mr. Binney, while the very learned and accurate reporter, in his syllabus, carefully uses the phrase "heir at common law" only, the counsel, of whom the reporter was one, and sometimes the court, have used the shorter expression "heir-at-law" as synonymous. Without venturing to assert that these and other instances to be found in our reports are evidences of careless diction, or of an inaccurate application of the language of English lawyers to the peculiar legislation of Pennsylvania, I may say, it is an usus loquendi peculiar to a class; it has not the force of authoritative definition, or of judicial decision, where the question is directly brought before the court. On the other hand, we have a case more like an adjudication of the point. In Ruston v. Ruston, 2 Yeates, 61, the question was made whether a proviso in a devise of land (by will, dated in 1784) to the eldest son, directing the payment of a sum of money, was a condition. It was argued that it could not be so, for the "heir-at-law" only can enter for the condition broken, which heir the defendant himself was. To this it was answered, that in Pennsylvania all the children are "heirs-at-law," or the "heir-at-law" of the father; and with this Chief Justice M'Kean, who delivered the opinion of the court, agreed, and said, "the defendant could not be considered, in this case, as heir-at-law in Pennsylvania, where, if, at that time, a person had died intestate, his real estate would have descended to all his children equally, the eldest son having only a double portion or share, and therefore the devise may even be considered as a condition." In this same view, in another case, (French v. McIlhenny, 2 Bin. 20,) when the two expressions come to be considered together, and therefore to be considered accurately, Chief Justice Tilghman observes, "In England the eldest son is heir; but here the law is more equitable, and the children together are considered as heirs." The persons on whom the law of Pennsylvania casts the estate of an intestate, if more than one, hold as tenants in common, or as co-parceners do in England, and in correct legal phraseology may be styled the 'lawful heir,' or the 'heir-at-law.'

But admitting that if this will had used the words "heir-at-law" alone as descriptive of the person to whom the whole estate is bequeathed, there might have been sufficient reason to doubt whether the testator had not intended thereby to describe the "heir at common law" in contradistinction to the heir-at-law by the statutes of Pennsylvania; we are, nevertheless, relieved from this uncertainty by the second description of the devisee in the will, intended to be explanatory of the first. The testator explains his meaning, by saying he intended to describe the party who would be his "lawful heir," in case he himself were legitimate. Now, it cannot be pretended that any one, either lawyer or layman, in Pennsylvania, when speaking of his "lawful heir," refers to the person who would inherit according to the law of England; or that, like the phrase "heir-at-law," it has been used in any special, peculiar, or professionally technical sense, as an equivalent or abbreviation of the more correct expression "heir at common law," or "next heir according to the course of the common law." The statute of 1705 expressly used it in the sense of any person to whom the statute itself gives the estate. How can the court be justified in construing the expression "heir-at-law" in its peculiar professional sense, according to the modus loquendi of a certain class, and not according to its legal and established definition, as the person or persons on whom the law casts the inheritance, when the testator himself has used another expression, as an equivalent or explanatory of the first, which never was used in that peculiar sense which has been carelessly given to the other, but agrees with

it in its legal and established definition? Nor is this argument subject to the retort which the lord chancellor said the counsel might have on each other, in Lowndes v. Stone, 4 Ves. 649, where A. devised his "estate to his next of kin or heir-at-law." "You have a fair retort," says he, "on each other; one side may contend that 'next of kin' means 'heir-at-law;' the other that 'heir-at-law' means 'next of kin.'" In that case the testator had ignorantly used terms as equivalent or synonymous which are incapable of the same definition. Here the term used as explanatory is capable of the same definition, and relieves the doubt as to whether the first was intended to be used in a special sense, not necessarily included in its general definition.

III. From what date is the will supposed to speak? The strict and legal meaning which the court assign above to the term "heir-at-law," and the decision hereafter given on this account on the admission of parol evidence, will render obvious the reasons of our decision on this point, argued by the counsel of the heir at common law, with so much learning. The maxim "Nemo est haeres viventis," applies; and it follows, that where a testator describes his intended devisee or legatee as the person on whom the law, at his death, would cast the inheritance of his estate, his will must, ex vi termini, be construed as speaking at the death of the testator, and not at the time of its execution. 1 Jarm. Wills, 287. It will also dispose of the argument raised by the same counsel,—

IV. That the expression "first paying" controls the otherwise settled meaning of the term "heir-at-law." It does not follow, or court is of opinion, because the testator gives some legacies to certain of his half-blood relations, that he intended to exclude them if one or more of them answers at the same time this clear, exact, settled, and legal designation of his will. Let us proceed to consider a remaining considerable point, illustrative of the reasons of our decision on these two last.

V. The admission of extrinsic evidence to show in what sense the testator used the phrase "heir-at-law." The difficulty presented in this will is not one arising upon a latent ambiguity, as where a testator bequeaths his estate to his nephew, John Smith, and has two or more nephews of that name. On the contrary the testator has described a certain person, or a certain class of persons, as the objects of his bounty: the description given cannot equally apply to two or more. If the testator declares that the haeres factus of his will shall be the same as the law would designate as his haeres natus, if he had died intestate, there can be no ambiguity to be explained by parol testimony. If A. B. be the person described by the will, it would be a perversion of law to suffer parol testimony to be admitted, to prove that the testator meant C. D. The statute of

frauds and perjuries would be annulled. Much of the extrinsic evidence, therefore, which by consent of the court, was conditionally taken and drawn into the discussion of this case, will have to be rejected. Conversations, related after the lapse of half a century, are seldom worthy of credit; and, even if believed, are no evidence of a testator's true intention. The declarations of a rich uncle to his numerous poor relations, may often be considered as made rather to conceal than to exhibit his real intentions. Again, suppose a testator should devise his property to such of his cousins as should be tenants of the manor of Dale, at the time of his death; and that, at the time the will was made, his cousin A. was tenant, but at the time of his death his cousin B. answered the description in the will; would the court admit evidence to show that the testator always lived, and had died under the impression that A. would be the person that would take under this devise? The will having declared the clear, paramount, and ruling intention of the testator, that a person should take, who, at the time of his death, should answer to a certain description; the fact that the testator never knew, or always laboured under a mistake, as to the person who would probably answer to that description, at the time of his death, would not affect the construction of his will.

Now the meaning of the term "heir-at-law," I consider to be settled, and that there is nothing within the four corners of this will which explains or controls that meaning, or shows any intention of the testator to use the word in any other than its technical legal import, to wit, "as the person or persons on whom the law would cast the inheritance of his real estate at his death." I consider the established principles of law, which bear upon the question, being the result of all the cases, to be clearly and correctly stated in the valuable treatise on wills, by Mr. Jarman. 2 Jarm. Wills, c. 28.

1st. Like all other legal terms, the word "heir," when unexplained and uncontrolled by the context, must be interpreted according to its strict legal import, in which sense it obviously designates the person or persons appointed by law to succeed to the real estate in case of intestacy.

2nd. It is clear, therefore, that where a testator devises real estate simply to his heir, or to his heir-at-law, or his right heirs, the devise will apply to the person or persons answering this description at the time of his death.

3rd. The circumstance, that the expression is "heir" (in the singular,) and that the heirship resides in, and is divided among several individuals as co-heirs, would create no difficulty in the application of this rule of construction; the word "heir" being in such cases used in a collective sense, as comprehending any number of persons who may happen to answer the description.

4th. It is true, that with respect to personalty, it is often doubtful whether the testator employs the term "heir" in its strict and proper acceptation, or in a more lax sense, as descriptive of the next of kin, or the person or persons appointed by law to succeed to property of · this description. Where the gift to the heirs is by way of substitution, this latter construction has sometimes prevailed, an example of which occurs in the case of Vaux v. Henderson, 1 Jac. & W. 388, note, where a testator bequeathed to A. £200, "and failing him, by decease before me, to his heirs," and the legacy was held to belong to the next of kin of A., living at the death of the testator. Sir R. P. Arden, M. R., in Holloway v. Holloway, 5 Ves. 399, was strongly disposed to give the same construction to the word "heirs" applied to personalty, though his opinion, on another question, rendered the point immaterial.

5th. But cases of this description must not be understood to warrant the general position that the word "heirs," in relation to the personal estate, imports next of kin, especially if real estate be combined with personalty in the gift; which circumstance, according to the principle laid down by Lord Eldon, in Wright v. Atkyns, 19 Ves. 299, affords a ground for giving to the word, in reference to both species of property, the construction which it would receive as to the real estate, if that were the sole object of disposition. Thus, in the case of Gwynne v. Muddock, 14 Ves. 488, where a testator gave all his real and personal estate to A. for life; adding, after her death, "her nearest heir-at-law to enjoy the same," Sir William Grant, M. R., held that the heir-at-law took both the real and personal estate, not the realty only, the testator having blended them in the gift.

6. And even where the entire subject of the gift is personal, the word "heir," unexplained by the context, must be taken to be used in its proper sense, nor will the construction be varied by the circumstance that the gift is to the heir in the singular, and there is a plurality of persons conjointly answering to the description of heir. Thus, under the · words "to my heir £4,000," three co-heiresses of the testator were held to be entitled; Sir J. Leach, M. R., observing, "where the word is used, not to denote succession, but to describe a legatee, and there is no context to explain it otherwise, then it seems to me to be a substitution of conjecture in the place of clear expression, if I am to depart from the natural and ordinary sense of the word heir." Mounsey v. Blamire, 4 Russ. 384.

Now, we have not here a legacy of money to "heirs" by way of succession; nor is there a syllable in the will indicating that the testator had any peculiar meaning of his own attached to the words "heir-at-law," or "lawful heir," or that he used the word "heir" as a synonym for "relations" or "next of kin."

On the contrary, he calls it his "estate," and not only so, but his estate "real and personal," and the person or persons designated to take it, are designated as the "heir-at-law" or "lawful heir." It is manifest that the testator did not intend that his property should be divided into real and personal after his death, and be given to different persons, but that the person or persons on whom the law would cast the inheritance of his lands at his death should have his personal property, subject only to the payment of debts and legacies.

Our decision on these five points disposes of every part of the case of John Aspden, the heir at common law. He has no claim to this estate, on any view of the case which we can take. But now arises a new question between new parties. The two parties of the half blood, neither of whom could get anything if the heir at common law was the person designated, and who therefore combined their forces as friends to dispose of his claims, now raise a question between themselves which they had reserved ,as against him, and upon which they now dispute separately with one another as strenuously as they before did jointly on the other question with the heir at common law. Assuming rightly that the estate is to go to whomsoever the law would cast the inheritance of the testator's lands; the Harrisons —the heirs ex parte paterna—claim the whole estate. And whether they shall have it all, or whether they must share it with the heirs ex parte materna, their late co-operators, the Hartleys, against the heir at common law, is this new question. The court apprehends fully the argument of the Harrison heirs. As being the only heirs ex parte paterna, they contend that they alone fulfil the description of "heir-at-law," or "lawful heir" of the testator, to the exclusion of the half blood ex parte materna; that the term heir has reference to an inheritance, and the question as to what person is designated by that term depends on the realty which is to be inherited; that this designation of the testator's intention to give his personalty to his heir,. instead of his next of kin, cannot depend on the validity of his title to the estate which the testator expects him to inherit. Thus, in England, if a man dies seised of lands which came to him by descent from his father, and without children, his cousin of the whole blood of his father will be his heir; but if his estate came to him from his mother, his cousin of the whole blood ex parte materna would be his heir. That, therefore, the term "heir-at-law," as designatio personae, in a will, has reference, ex necessitate, to something dehors, or without the will, which must be known in order to ascertain the intention of the testator. That the law of Pennsylvania, while it substitutes nearer kindred of the half blood to more distant kindred of the whole blood, adopts the same principle, viz. that the heir must

be of the blood of the first purchaser. That the testator having never owned any property, except that which came to him from his father, and having never voluntarily parted with it, but having tenaciously claimed it all his life (believing his attainder and the forfeiture of his property was not only unjust but illegal), must be supposed to designate and intend by the description "heir-at-law or lawful heir" only such person or persons as would stand in that relation to the property which he expected to descend to his heir. That if it is competent to receive parol testimony as to what estate he died seised of, and how the title to it devolved upon him, it is equally competent to ascertain in this way what property he claimed or supposed would descend to his heir, especially as it appears on the face of the will that he supposed himself seised of some real estate, and his intention must be the same whether he was right or wrong in that claim, belief, or supposition. And consequently, that the testator having never owned or claimed to own any property but that which was devised to him by his father, his nephews and nieces of the maternal half-blood would have inherited nothing from him, and the description of heir-at-law or lawful heir could not possibly attach to them.

The court acknowledges the force of this argument. Let us then consider the question, 1st, on the undisputed fact that the testator was not seised of any real estate at the time he made his will, or afterwards; and, 2d, consider whether the unfounded belief that he was the rightful owner of certain property which was devised to him by his father, can be received to vary the result.

1st. It is not true, either in legal or popular parlance, that there can be no heir where there is nothing to be inherited. A man's children and other kindred may be described or designated as heirs, whether they take anything from their ancestor or not. Thus, in Counden v. Clerke, Hob. 31a, it is said: "But this (the words 'right heirs male') hath a divers consideration in cases of descent, and in case of purchase. For the word heir is sometimes taken absolutely, and as the Grecians call it, $a\pi\lambda\omega\varsigma$, or simpliciter, sometimes $\chi a\tau a$ $\tau\iota$, or secundum quid, or per accidens; sometimes in abstracto, standing naked by itself, or of itself; and sometimes in concreto, clothed with land or rent, in respect of which he may be heir, as the word is here. For example, the younger son in borough English, is heir, and all the sons in gavelkind; whereof the reason is, because the custom of those lands is, that they must descend to the younger sons, or all the sons; so they are heirs secundum quid of those lands, in point of descent, or when they descend, for then they are within the custom that gives the inheritance." Hence, a bequest of personal estate "to my heir-at-law,"

or "right heir," would not be void for want of some person to take, even though the testator should not die seised of real estate. And whether a bequest by a man seised only of property by inheritance from his mother, to his "right heir," or "heir-at-law," would be interpreted as describing his right heir simpliciter or in abstracto, and not his heir secundem quid, or special heir of the particular estate, is possibly an open question. But in a case in 3 Lev. 406, (Godbold v. Freestone,) an heir ex parte materna limited (by deed) several estates, with reversion to his "right heirs," and it was decided that the reversion should go to his right heirs secundum quid, that is, to his heir ex parte materna.

Now, admitting that a devise of Blackacre "to his heir-at-law," or "right heir," by a testator who inherited it from his mother, would be construed as a devise to his heir ex parte materna, or his heir quoad hoc, and that such person would hold by descent, and not by purchase, on the supposition that the testator meant to describe the person who would, at his death, be the lawful heir of the thing devised; and admitting that a bequest by the same person of all his real and personal estate to his heir-at-law would be construed as a designation of the person on whom the law would cast the estate of Blackacre at his death, it is evident that it is the character impressed upon the thing devised of descending to the heir, and to which the testator is supposed especially to refer, which is seized upon by the court to justify them in thus narrowing or changing the general term heir-at-law or right heir, so as to mean his special heir, or heir quoad hoc; and their desire to follow that canon of descent which requires the heir of an estate to be of the blood of the first purchaser. But in case of a bequest of personal estate to the testator's heir-at-law, when he has no special heir, there is no reason for departing from the plain and obvious meaning of the term, nor is there any character impressed upon the thing devised which can restrain it to the blood of the first purchaser. For I do not join in inclination of opinion with Sir R. Pepper Arden, who, in the case of Holloway v. Holloway, 5 Ves. 399, was inclined to think, though he did not assert nor decide, that a bequest in trust for "such person as shall be my heir or heirs-at-law," should be construed "heirs quoad the property," meaning "next of kin." But I concur with what he was further inclined to say in the same case, "that in such case the court would consider the testator as the first purchaser," and, as a consequence thereof, would give a bequest of personalty to "my heirs-at-law," or "right heir," or "lawful heir," the same designation as if it had been a devise of lands acquired or purchased by the testator. But to apply these principles more especially to the case

before us. The testator left at his death a nephew, A., of the paternal half-blood, and a nephew, B., of the maternal half-blood (who, for our present purpose, may represent the two stocks of relatives,) and a cousin, C., of the whole blood ex parte paterna. C. was his heir presumptive at the time this will was made, in 1791. But when a testator describes his heir-at-law, or lawful heir, as the person that shall take his property, he intends such person or persons as shall be found to sustain that character or description at the time of his decease, by the law of the country of his domicile. By the law of Pennsylvania, the persons who would answer to that description in 1824, when the testator died, are A. and B. By that law, they together constitute the lawful heir of the testator in the abstract or simpliciter, and are preferred to C. They take the personal estate by purchase, as the persons described in his will. There is no real property which either would take in exclusion of the other. The terms heir-at-law, or lawful heir, as descriptive of the person to take, are not narrowed by accident to a particular subject, nor are we required to look to the exception in the act, or compelled to give to general terms a special application, in order to conform to a principle of law which excludes the heir general, in order to continue the inheritance of the blood of the first purchaser. The exception in the act, which constitutes one of them as heir to the exclusion of the other, through an accidental quality attached to the thing to be inherited, has not occurred, and the question of preference does not arise. Being, therefore, equally within the description of persons entitled to take under the will, they must take jointly.

2nd. "Can the evidence of the testator's unfounded belief that he was owner of certain property devised to him, be received to show an intention different from that expressed in his will?" In construing wills it is often necessary to receive parol testimony, as to the property and persons described in it, in order to apply the devises and bequests to the proper persons and things. And in this way a latent ambiguity may be discovered, which must of necessity be resolved by testimony of the same description.

Now, as we have seen, the reason for construing the general terms of description in a special or narrowed sense, arises from the disposition of the courts to favour the policy of the law, which confines the descent of real estate to the blood of the first purchaser, and the presumption that such was the intention of the testator. And, admitting, for the sake of argument, that the half-blood ex parte materna would have been excluded by this description, if the testator had died seised of his paternal estate, what evidence have we that he would have given it a different destination from that which it now

receives, had he believed otherwise? He did not know, when he made his will, that, before his death, the law of descents would be changed in Pennsylvania, yet, having willed that the law, as it existed at the time of his death should designate the person who should take his property, what right have we to say that he would have made a different will, if he had anticipated the fact of its change? He lived thirty years after the law was changed, and did not change his will on that account. He lived long enough to satisfy any reasonable man that he never would regain his paternal estate. The statute of limitations had twice run against his fancied claim before his death, and yet he made no change in the designation of the person who should take his estate, but left it to the law to settle that question, as the case might be, at his death. We have refused to receive evidence that he lived and died in the belief that his lawful heir would be the son of some of his English cousins. His will, clearly expressed, could not be interpreted by his false notions, because it would be conjecture to say that he would have changed his will had his notions been different. It is equally conjecture to presume that he would have changed it, had he entertained correct ideas as to his real estate. The testimony introduced on this subject is to limit the description of his devisees, or rather to change the destination of his property, unambiguously expressed, both as regards persons and things, to a different person or class of persons, by declarations of the testator of an absurd belief, when it cannot be proved that he would have given a different destination to it, if his knowledge or belief had been different. Such a construction, founded only on conjecture, would annul the statute of frauds, "and leave titles depending on intention to the decision of chance and the sport of opinion." I am of opinion, therefore, that both stocks of half-blood are equally entitled to the property in dispute, and take it under the description in the will, as "heir-at-law" or "lawful heir;" and that a different intention, in favour of one class to the exclusion of the other, cannot be inferred, from the fact that the testator had mistaken notions in regard to his ownership of real property, at the time he made his will and afterwards, and that such evidence cannot be received to narrow the construction of the clear, unambiguous description of his will, as connected with the actual situation of the property and persons referred to in it.

Let me now say, in conclusion of this long pending, important and difficult case, that although made after careful investigation, and with an anxious desire to arrive at the truth, I feel that my opinion is not so certainly right, as I could desire to feel that it is. And that it is a source of great satisfaction to me to believe that it will be review-

ed by my brethren and myself in the highest tribunal of the country.

### Equity Docket, No. 1, April sessions, 1828.

NOTE. [from original report.] From the final decree of the court, which was in conformity with the opinion above given, appeals were taken to the supreme court by the heir at common law, and by the Harrisons', so far as related to the parts of the estate from which they were excluded: the question of domicil, passed upon in the case of White v. Brown, [Case No. 17,538,] along with the evidence in that case, which was all documentary, being also taken up with this decree. The parties of the half-blood, here again joined their force. Their counsel, maintaining the Pennsylvania domicil, contended that the fact had been established by the verdict of a jury, upon an issue directed for that purpose by the court below: that the judge who directed the issue, was satisfied with the verdict, and refused a new trial: that under such circumstances, a very strong case must be made out, in order to induce an appellate court to send the cause back for a new trial: and that the law upon that subject is well stated by Lord Lyndhurst in Collins v. Hare, 1 Dow. & C. 139, in these words, "As the issue was directed for the purpose of informing the conscience of the equity judge, if the main object was gained it was sufficient. The judges both at law and equity were satisfied with the verdict, and therefore it must be a strong case indeed, that should induce your lordships to send the matter to a new trial, in opposition to the opinion of the late noble chancellor of Ireland, who had a much better opportunity of investigating the facts on which the case mainly depended, than your lordships have." An examination of the evidence, which was made by the counsel of the half-blood, showed, they contended, that the weight of it was altogether on the side of the American domicil:

On the other hand, the counsel of the heir at common law, contended that, the testator's domicil was England; that the verdict of the jury interposed no obstacle to a decision conformably to the evidence which appears on the record; that the object of the issue was to instruct the conscience of the chancellor, and like all the other proceedings in the circuit court, is the subject of review in the supreme court: that "the chancellor may, if he thinks fit, make no use whatever of the verdict, but treat it as a mere nullity." Gres. Eq. Ev. 405; [Mem.,] 6 Madd. 58; [Ex parte Learmouth. Id.] 113; Harrison v. Rowan, [Case No. 6,141.] They cited a Pennsylvania case, where, on an appeal, the supreme court disregarded a verdict, reversed a decree made in conformity to it, and remanded the case, without sending it to another jury, with instructions to the inferior court to enter a different decree. They relied on the opinion of Coulter, J., who, in delivering the opinion of the court, said: "It was contended by his counsel here, on the argument, that the verdict ought to be, and is conclusive. In a court proceeding according to the forms of the common law, the verdict of a jury is of high import and great solemnity; although, even then one verdict is not conclusive in any case, if against the weight of evidence. The court may set it aside, and grant a new trial. But in a court of equity, its effect and function is entirely different. In that court it is used merely for the purpose of informing the conscience of the court, and is incidental and auxiliary. A chancellor cannot, if he would, surrender his high prerogative and duty of deciding upon facts, according to the convictions of his conscience. In that court, the wisdom of our ancestors deposited the faculty of deciding upon facts within its jurisdiction, as well as determining the rules of equity applicable to them. And where, after

all, could the power be more safely lodged, especially in cases of trusts and fiduciary transactions? Long experience, the habit of sifting and comparing testimony, calm deliberation and exemption from local prejudices, seems to give a guaranty for enlightened judgment. A chancellor will examine the notes of evidence by the judge who tried the cause, listen to the explanation of counsel, and, at last, if his conscience is not satisfied, will decide the cause according to his own convictions, and disregard the verdict of the jury." The counsel argued that there is no writ of error in the case of an issue directed for the information of a chancellor, who may after all, disregard the verdict, and that if the verdict enter into the decision of the cause, they had no other remedy that an appeal, which must necessarily be co-extensive with the final decree of the circuit court. Com. v. Judges of Court of Common Pleas, 4 Pa. St. 302. Domicil, they argued, is a mixed question of law and fact; that it is not the verdict, but the evidence, which exhibits the facts from which a correct estimate may be formed of the sense in which the testator used the language in his will; that the jury disregarded the only facts of importance in the controversy; the testator's education and residence for more than fifty years in England, his English doctrines, prejudices and associations, his long absence from Pennsylvania, his embittered feelings towards that state, and every other consideration, calculated to cast light on the meaning of the terms he used, &c. And they went, as did the counsel of the heirs of the half-blood, over the whole case of White v. Brown, already reported. [Case No. 17,538.]

The supreme court heard, at great length, the argument on both sides, as to this question of domicil, as well as upon all the questions reported in the present case. But no opinion was ever delivered in that tribunal. The court was equally divided as to affirming the decree, (See Brown v. Aspden, 14 How. [55 U. S.] 25;) and it was therefore simply affirmed. It was understood by the profession, that the chief difficulty with their honours was, the question of domicil: and it is, perhaps, not easy entirely to reconcile the verdict in the case with certain parts of the language of the judge who gave the opinion of the supreme court delivered at the same term, in the case of Ennis v. Smith, involving the question of the domicil of General Kosciusco. See 14 How. [55 U. S.] 400. On the effect in law of a judgment by an equally divided court, see Krebbs v. Directors of Carlisle Bank, [Case No. 7,932.]